NORTHERN NATURAL GAS
COMPANY, Petitioner,

v.

CONOCO, INC., Respondent.

No. 97–0182.

Supreme Court of Texas.

Argued Dec. 4, 1997.

Decided Oct. 22, 1998.

Opinion Overruling Rehearing April 1, 1999.

**604**

Eugene A. Cook, Deanne M. Noel, Gael Plauché, Houston, Steven L. Hughes, El Paso, Franklin R. Bay, Jane G. Alseth, Mark C. Schroeder, Omaha, Carrin F. Patman, Houston, Ernest E. Smith, III, Austin, for Petitioner.

G. Luke Ashley, Dallas, John A. "Jad" Davis, Midland, Brock G. Ridgway, Houston, Robert P. Crumpler, Jr., Dallas, Holly Beth Williams, Midland, for Respondent.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice GONZALEZ, Justice HECHT, Justice SPECTOR, Justice OWEN, Justice BAKER, and Justice ABBOTT join.

We grant Conoco's motion for rehearing, withdraw our opinion dated April 14, 1998, and substitute the following in its place.

This case requires that we review the lower courts' interpretations of a natural gas processing and transportation agreement (the "Agreement"). The trial court adopted Conoco's interpretation of the Agreement and rendered a $20 million judgment for Conoco based on a jury finding that Northern breached the Agreement. The court of appeals reversed the judgment for Conoco, but remanded for a new trial to determine whether Northern breached an implied duty of good faith. 939 S.W.2d 676. We affirm the court of appeals' judgment for the reasons expressed herein.

## I. FACTS

Northern and CRA, Inc., Conoco's predecessor-in-interest, signed the Agreement in 1979. Northern is an interstate natural gas pipeline. In 1979, Northern had dozens of contracts to buy natural gas from gas producers in Texas and elsewhere. Before Northern could ship the gas for resale to customers in the Midwest, the gas had to be gathered and compressed at a processing facility such as CRA's.

Three provisions of the Agreement are particularly relevant to this case. First, the Agreement provided that Northern would deliver, and CRA would process, "all of the gas [that] Northern purchases and receives, in accordance with Northern's gas purchase contracts with producers, ... in keeping with all the quantity and other provisions of the

various gas purchase contracts in effect from time to time." Second, the Agreement was to remain in effect "for so long as the various Gas Purchase Contracts dedicated hereunder remain in effect, but not less than twenty (20) years . . . ." Third, the Agreement stated that it "shall be interpreted in accordance with the rules of construction and interpretation set forth in the Texas Uniform Commercial Code."

In 1984, Northern and CRA, which by then had changed its name to Farmland, signed an amendment that specifically altered three provisions of the Agreement. This 1984 Amendment also added new wells on which Northern had acquired gas purchase contracts. The 1984 Amendment reaffirmed the Agreement "[e]xcept as herein specifically supplemented and modified . . . ." The Amendment did not explicitly alter the Agreement's twenty-year term, but it did provide that the Agreement would apply to both the original and the new wells "for the productive life of the wells."

Between 1978 and 1992, Congress enacted and the Federal Energy Regulatory Commission ("FERC") implemented a series of measures that fundamentally altered the natural gas industry. For our purposes, the details of the regulatory transformation are less important than the result. Before 1978, federal regulations tightly controlled natural gas prices and markets; i.e., gas producers had to sell to pipelines such as Northern at regulated prices, and then Northern would transport its gas, after processing, to its customers, who bought the gas at equally regulated prices. By 1992, gas producers were free to sell to whomever they chose at deregulated prices, pipelines' customers had ceased buying gas from the pipelines, and the pipelines were encouraged to buy out their gas purchase contracts with producers and were required to become common carriers: collecting a fee for transporting gas between various producers and end-use customers without buying and reselling it. The new regulatory structure forced pipelines to cease their prior practice of buying and reselling gas. The change in Northern's business was dramatic; Northern's gas purchases and sales dropped from 3 billion cubic feet per day in the mid–1980s to zero in 1994 as Northern canceled or declined to renew each of the gas purchase contracts.

In July 1989, Conoco bought Farmland's processing plant, and with it Farmland's rights under the Agreement. In 1992, Conoco sued Northern for breach of contract, alleging that Northern's attempts to extricate itself from the gas purchase contracts violated the Agreement. The trial court agreed with Conoco's contractual interpretation, instructing the jury that the Agreement, as amended in 1984, unambiguously obligated Northern "to purchase and deliver to Conoco, Inc. all gas reserves from dedicated wells during the productive life of the wells." 939 S.W.2d at 678. So instructed, the jury awarded Conoco more than $20 million in lost processing profits, and the trial court rendered judgment for that amount.

The court of appeals reversed the trial court's judgment, holding that the Agreement unambiguously required Northern to deliver for processing any gas that it purchased during a twenty-year period, and longer if any gas purchase contracts remained in effect longer than twenty years, but did not require Northern to actually purchase any gas. Id. at 680. Rather than render judgment for Northern, however, the court of appeals remanded for a trial about whether Northern breached a duty of good faith by canceling all of its gas purchase contracts. Id. at 680–81.

Both parties assign error to the court of appeals' judgment. Conoco asserts that the court of appeals misinterpreted the Agreement's quantity obligations and term and failed to define Northern's good-faith obligation adequately. Northern alleges that the court of appeals erroneously put a good-faith limitation on Northern's freedom to cancel the underlying gas purchase contracts and mistakenly failed to discuss several of Northern's points of error that would have required rendering judgment for Northern.

## II. THE AGREEMENT'S QUANTITY REQUIREMENTS AND TERM

■ Conoco claims that the court of appeals should have affirmed the trial court's conclusion that the 1984 Amendment extend-

ed the Agreement's term to equal the productive lives of the wells and extended the quantity obligations to equal the wells' possible production. Alternatively, Conoco argues that the quantity requirements and term are ambiguous and therefore present jury questions.

We agree with the court of appeals' analysis of the Agreement's quantity requirements and term. Giving the language its plain meaning and construing it to avoid rendering any language meaningless, only one plausible construction of the Agreement and the Amendment exists: Northern was obligated to deliver for processing all gas that it bought under the dedicated gas purchase contracts for twenty years, and as long thereafter as purchases continued under those contracts, but Northern was never obligated to perpetuate the gas purchase contracts or to deliver any gas for processing if no gas was purchased. Therefore, we affirm those parts of the court of appeals' judgment addressing quantity and term for the reasons stated in the court of appeals' opinion.[1]

### III. Good Faith under the Uniform Commercial Code

Conoco urges us to rely on two Uniform Commercial Code sections—Texas Business and Commerce Code sections 1.203 and

2.306—to affirm the court of appeals' decision to remand for trial the question of whether Northern canceled the gas purchase contracts in good faith. As noted above, the Agreement provides that it should be interpreted in keeping with the provisions of the Uniform Commercial Code. Nevertheless, we see nothing in that Code that will support the court of appeals' judgment.

The first section to which Conoco directs our attention states the general rule that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Tex. Bus. & Com.Code § 1.203. However,

> [t]his section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.

*Id.* cmt.; *accord Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 482 (Tex.App.—Corpus Christi 1989, writ denied).[2] The Agreement nowhere imposes on Northern a duty or an obligation to maintain the gas purchase contracts. In the absence of a specific duty or

---

1. The court of appeals states very clearly that "the Agreement requires only that Northern deliver gas to Conoco in keeping with its gas purchase contracts covering dedicated wells as those contracts are in effect from time to time." 939 S.W.2d at 680. This is the holding that we affirm. To the extent that the court of appeals' vaguely worded sentences following this quote can be read to impose upon Northern a duty to maintain the gas purchase contracts for twenty years, or a duty to deliver gas for twenty years regardless of the termination of the gas purchase contracts, we disavow them.

2. The vast majority of courts that have considered this question agree that Uniform Commercial Code section 1.203 does not state an independent cause of action. *See Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.,* 825 F.2d 167, 175 (8th Cir.1987); *Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 677 (D.Md.1993); *Management Assistance, Inc. v. Computer Dimensions, Inc.,* 546 F.Supp. 666, 677 (N.D.Ga.1982), *aff'd sub nom. Computer Dimensions, Inc. v. Basic Four,* 747 F.2d 708 (11th Cir.1984); *Government St. Lumber Co., Inc. v. AmSouth Bank, N.A.,* 553 So.2d 68,

72 (Ala.1989); *State v. De Anza Corp.,* 416 So.2d 1173, 1176 (Fla.Dist.Ct.App.1982); *Lake Tightsqueeze, Inc. v. Chrysler First Fin. Servs. Corp.,* 210 Ga.App. 178, 435 S.E.2d 486, 488 (1993); *Washburn v. Union Nat'l Bank & Trust Co.,* 151 Ill.App.3d 21, 104 Ill.Dec. 242, 502 N.E.2d 739, 743 (1986); *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.,* 276 N.J.Super. 163, 647 A.2d 852, 857 (1994); *Super Glue Corp. v. Avis Rent A Car Sys., Inc.,* 132 A.D.2d 604, 517 N.Y.S.2d 764, 766 (N.Y.App.Div.1987); *NationsBank of Va., N.A. v. Mahoney,* 1993 WL 662334, at *2 n. 3, 22 U.C.C. Rep. Serv.2d 633 (Va. Cir. Ct.1993); *Central Va. Bank v. Bell,* 1989 WL 418682, at *9, 9 U.C.C. Rep. Serv.2d 422 (Va. Cir. Ct.1989); *see also* 1A Anderson, Uniform Commercial Code § 1–203:14, at 200–01 (3d ed.1996). *But see Reid v. Key Bank,* 821 F.2d 9, 13 (1st Cir.1987); *Martin Specialty Vehicles, Inc. v. Bank of Boston (In re Martin Specialty Vehicles, Inc.),* 87 B.R. 752, 765 (Bankr. D.Mass.1988), *rev'd on other grounds,* 97 B.R. 721, 729 (D.Mass.), *appeal dismissed,* 892 F.2d 5 (1st Cir.1989).

obligation to which the good-faith standard could be tied, section 1.203 will not support Conoco's claim for damages.

■ Likewise, the other section on which Conoco relies, section 2.306 of the Business and Commerce Code, cannot support remand on the question of good faith. Section 2.306 addresses, among other things, contracts for the sale of goods when the quantity term is indefinite—tied either to the buyer's requirements or to the seller's output. TEX. BUS. & COM.CODE § 2.306(a). Section 2.306 requires that the quantity be such as actually occurs in good faith. *Id.* Conoco asserts that this section requires Northern to prove that its cancellation of the gas purchase contracts occurred in good faith, because the Agreement is really an output contract, albeit for processing the output rather than buying it.

We accept that the Agreement's choice-of-law provision's call for interpretation under the Uniform Commercial Code was sufficient to adopt section 1.203 and the other general rules of Article One. But the parties did not adopt Article Two's rules on sales of goods any more than they adopted Article Three's rules on commercial paper or Article Nine's rules on secured transactions. We cannot ignore the service nature of the Agreement and subject it to statutes written specifically for sales. Therefore, we will not import into the Agreement a requirement from the Code's sales article.

## IV. GOOD FAITH AND MUTUALITY

■ Conoco further argues that this Court must place a good-faith limit on Northern's ability to cancel its gas purchase contracts because the alternative—Northern's freedom to cancel those contracts at will—would render the contract illusory and void for lack of mutuality.

In support of its position, Conoco cites two Texas cases that examined contracts that imposed no explicit duties on one of the parties to the contract. *See Clement v. Pro-*

*ducers' Ref. Co.,* 277 S.W. 634 (Tex. Com. App.1925, judgm't adopted); *Holguin v. Twin Cities Servs., Inc.,* 750 S.W.2d 817 (Tex.App.—El Paso 1988, no writ). In both of these cases, the court examined the contract's purpose and imposed an implied obligation on the otherwise uncommitted party to avoid holding the contract void for lack of mutuality. *See Clement,* 277 S.W. at 635 (relying on the "purpose" and "nature" of the agreement, and on the promises and expenses of the sales agent appointed by the contract, to bind a petroleum company to furnish products for the agent to sell); *Holguin,* 750 S.W.2d at 818–19 (avoiding a finding that the contract at issue lacked mutuality by "determin[ing] that the contract before us implies an obligation on Appellee's part to provide the subject matter" of the contract).[3]

■ Both *Clement* and *Holguin* state that obligations should be implied only "[w]here no other consideration is shown," making an implied obligation necessary to avoid holding the contract void for lack of consideration. *Clement,* 277 S.W. at 635; *accord Holguin,* 750 S.W.2d at 819. Here, however, the Agreement is supported by consideration completely apart from the court of appeals' implied good-faith obligation. Consideration is defined as "either a benefit to the promisor or a loss or detriment to the promisee. Surrendering a legal right represents valid consideration." *Receiver for Citizen's Nat'l Assurance Co. v. Hatley,* 852 S.W.2d 68, 71 (Tex.App.—Austin 1993, no writ) (citations and quotation omitted). Northern's promise to deliver for processing all gas that it receives under the gas purchase contracts is the surrender of a legal right and therefore is sufficient consideration. *See id.* Because consideration exists apart from the good-faith duty that the court of appeals inferred, the Agreement does not lack mutuality according to its express terms, rendering *Clement* and *Holguin* irrelevant to this case.

Conoco relies heavily on one additional case, *Portland Gasoline Co. v. Superior*

---

**3.** Conoco cites a third case that repeats the rules originally enunciated in *Clement* but is factually distinguishable. *See Texas Gas Utils. Co. v. Barrett,* 460 S.W.2d 409 (Tex.1970). In *Barrett,* both parties had express obligations under the contract, but one claimed that a clause stating that it "assumes no obligation ... and shall not be liable" relieved it of the duties stated elsewhere in the contract. *See id.* at 411–12. We held that the explicit, "mutually imposed obligations are not negated by the language used." *Id.* at 413.

*Mktg. Co.*, 150 Tex. 533, 243 S.W.2d 823 (1951). Portland, a natural gas processor, entered into a marketing contract with Superior. *See id.* at 826. Portland promised to deliver to Superior "all of the net butane and propane mixture that it produces," and Superior promised in return to market the mixture to customers, collect on sales, and share the proceeds with Portland. *Id.* Paragraph Five of the contract provided that, although the parties expected the daily production to exceed 10,000 gallons, Portland would not be in default if it delivered less than that amount so long as what it delivered was its total production. *See id.* Superior argued that Paragraph Five made the entire contract illusory, because Portland could cease production entirely and thereby avoid any obligation. *See id.* at 827. We held that mutuality was not lacking and noted that "in this contract there was the implied promise of Portland to manufacture and deliver the mixture to Superior...." *Id.*

We think the result in *Portland Gasoline* was correct; the contract was not void for lack of mutuality. We also think the legal principles stated in the opinion are valid, such as the essential holding of *Clement*— "Mutuality may result from an implied obligation on the part of one of the parties." *Id.* at 825 (quotation omitted). However, we need not have imposed on Portland an implied obligation to produce and deliver the natural gas mixture because mutuality was not otherwise lacking; Portland's promise to deliver all the mixture that it produced was sufficient consideration to support the contract. Indeed, *Portland Gasoline* has been squarely criticized for needlessly imposing an implied obligation:

> This was rightly held to be a bilateral contract, not lacking in "mutuality." Portland did not expressly promise that its factory would run or that there would be any "output." The court appears to find such a promise by implication ("implied promise of Portland to manufacture and deliver," 243 S.W.2d at 827)[,] intimating that such an implication is necessary to the validity of the contract. *It is not.*

2 JOSEPH M. PERILLO & HELEN HADJIYANNAKIS BENDER, CORBIN ON CONTRACTS § 6.7, at 274 n. 1 (rev. ed.1995) (emphasis added).

We agree that an implied obligation was unnecessary in *Portland Gasoline* and to the extent *Portland Gasoline* found that such an implied obligation was necessary for the contract to be enforceable, we overrule it.

## V. GOOD FAITH AND OUTPUT/REQUIREMENTS CONTRACTS

■ Finally, Conoco argues that this Court should impose a good-faith obligation on Northern because the Agreement is an output/requirements contract, and a party should not be able to cease business and thereby cancel such a contract unless the cessation is in good faith. Several jurisdictions have applied this principle to service contracts as well as to sales contracts. *See William S. Gray & Co. v. Western Borax Co.*, 99 F.2d 239, 242 (9th Cir.1938); *DuBoff v. Matam Corp.*, 272 A.D. 502, 71 N.Y.S.2d 134, 136 (N.Y.App.Div.1947). Indeed, the seminal case that first enunciated the common-law requirement that changes in the quantity of output/requirements services be in good faith was a contract for services, not sales. *See Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 118 N.E. 214, 215 (1917).

■ Nothing requires the seller in an output contract to have any output, and nothing requires the buyer in a requirements contract to have requirements. On the other hand, parties to output/requirements contracts are required to exercise good faith in determining outputs or requirements, as well as accept the concomitant risk that their counterparts to the contract may make good faith variations, even to the extent of liquidating or discontinuing the business. *See HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3d Cir.1966); *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471, 473 (3d Cir.1942). We agree with Conoco that a party who seeks to avoid performance of an output contract by having no output—or of a requirements contract by having no requirements—may not do so in bad faith. Accordingly, we affirm the court of appeals' judgment remanding this cause for a new trial for Conoco to attempt to

prove that Northern canceled its gas purchase contracts without a valid business reason and in bad faith. *See HML Corp.*, 365 F.2d at 83 ("It follows that since plaintiff claimed a breach it was its duty to prove it, and the burden, therefore, rested upon it to show that defendant had acted in bad faith."); *Fort Wayne Corrugated*, 130 F.2d at 473.

We affirm the court of appeals' judgment.

Justice HANKINSON not sitting.

Justice ENOCH delivered the supplemental opinion of the Court on rehearing, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice BAKER, and Justice ABBOTT, join.

Northern asks on rehearing that we render judgment in its favor because it contends there is no evidence that it ceased to have requirements without a valid business reason and in bad faith. We express no opinion on this contention, as this is the first time it has been raised. *See* TEX. R. APP. P. 33.1(a). Nothing in our opinions in this cause precludes Northern from seeking relief by dispositive motion on this or any other ground on remand.

Northern also argued at the court of appeals that even if it breached the Agreement with Conoco, there is no evidence that Conoco sustained any damages. However, the court of appeals did not consider Northern's no-evidence points of error. Because these points could be dispositive, we consider them here. *See Lone Star Gas Co. v. Railroad Comm'n of Texas*, 767 S.W.2d 709, 710 (Tex. 1989); TEX. R. APP. P. 53.4.

█ The jury separately awarded past damages and future damages. Northern's only challenge to the calculation of past damages is its contention that Conoco profited more than it would have if Northern had continued to have requirements under the Agreement. The record does not support this position.

After Northern ceased to have transportation or processing requirements, Conoco acquired gas reserves that were formerly dedicated to its Agreement with Northern and then dedicated those reserves to a contract under which Conoco sold gas to Lone Star Gas Company. The profits on sales to Lone Star were greater than the profits Conoco would have made under the Agreement. However, Conoco presented undisputed evidence that at all times except for one month (for which Northern was given credit in the damage calculations), Conoco had other sources of supply dedicated to the Lone Star contract from which it could have satisfied Lone Star's demands. Conoco sold all gas produced above and beyond Lone Star's demand on the spot market. Spot market prices were far less than the prices Lone Star paid.

Northern contends that the damage calculations should reflect the prices paid by Lone Star, not the lower spot market prices. Northern relies heavily on the fact that Conoco allocated the actual sales to Lone Star back to properties that had been dedicated to the Agreement. But, as already noted, Conoco put forth evidence that it could have simply interchanged the gas formerly dedicated to the Agreement with Conoco's other sources of supply to meet Lone Star's demand. The volume of gas sold by Conoco to Lone Star would have been unchanged, and the volume sold on the spot market would have been unchanged. If Conoco had not bought any of the gas formerly dedicated to the Agreement, it would have sold a lower net volume on the spot market, but the volume of gas it sold to Lone Star would have been the same. Thus, there was some evidence to support Conoco's position that it was not inappropriate to utilize spot market prices to calculate its past damages.

Because there is some evidence to support the jury's award of past damages, we cannot render judgment for Northern. And because we cannot render judgment, it is unnecessary to consider Northern's complaints regarding the future damages awarded by the jury.

Northern's motion for rehearing is overruled.

Justice HANKINSON, Justice O'NEILL, and Justice GONZALES, not sitting.