NATURAL GAS V. MIDGARD



NO. 07-01-0282-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



MAY 8, 2003


______________________________



NATURAL GAS CLEARINGHOUSE
,




 Appellant


v.



MIDGARD ENERGY COMPANY, FORMERLY KNOWN AS 


 MAXUS EXPLORATION COMPANY,

 


 Appellee

_________________________________



FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;



NO. 79,496-B; HON. JOHN B. BOARD, PRESIDING


_______________________________





Opinion


________________________________



Before JOHNSON, C.J., QUINN, J., and BOYD, S.J. (1)

 Natural Gas Clearinghouse (NGC) appeals from a final judgment awarding
damages to Midgard Energy Company, formerly Maxus Exploration Company (Maxus), for
breach of contract. It argues, through 11 issues, that 1) it did not breach the contract, 2)
the testimony of Maxus' expert witness was inadmissible and constituted no evidence of
damages, 3) a portion of the award includes "speculative damages" which could not be
awarded, 4) the amount of prejudgment interest awarded was inaccurate, and 5) the
amount of attorney's fees awarded was inaccurate. We affirm the judgment in part and
reverse and remand in part.

Background


 Before us is the latest chapter in the continuing saga of Maxus versus NGC. 
Having initially reversed, in part, a summary judgment granted to Maxus, see Natural Gas
Clearinghouse v. Midgard Energy Co., 23 S.W.3d 372 (Tex. App.--Amarillo 1999, pet.
denied), we remanded the cause for further proceedings. Upon remand, a trial was had
to the court. As a result of same, the trial court found that NGC had breached its
agreement with Maxus to deliver a specified quantity of gas over a term of five years. This
breach caused Maxus to suffer damages in the amount of $2,781,415.73. Furthermore,
the trial court awarded Maxus pre and post judgment interest and attorney's fees. NGC
appealed once again.

 The agreement in question underwent amendment after its inception. The relevant
provisions in existence at the time of the breach follow:

 Whereas, Maxus operates the Roger Mills Gas Processing Plant . . . which
is capable of extracting liquefiable hydrocarbons from the gas contained in
NGC's Pipeline Gas . . .,


 Whereas, NGC has control of certain volumes of gas that are available for
processing . . .,

 

 1.6 "Pipeline Gas" or "Gas" shall mean NGC's natural gas without the removal
of any of its constituents, as it is produced from the well, and delivered at the
discharge side of a conventional mechanical type separator, treater or tank,
and shall include gas produced from a well producing natural gas only, or
from a well producing distillate, condensate, or oil with the gas . . .,


* * *



 2.1 Facilities - NGC owns and has installed the necessary facilities for the
delivery of gas to the Processing Plant . . .,


* * *



 3.1 Delivery of Gas by NGC - NGC agrees to deliver and [Maxus] agrees to
receive, or cause to be received at the NGC Delivery Point the lesser of a
quantity of gas equal to 1) all volumes produced into NGC Muletrain Lateral
and NGC Moorewood East Lateral which collectively exceed 20,000,000
cubic feet of gas per day based on an annual average, or 2) a volume
representing available spare processing capacity at the Plant . . . . Except
for connecting [Maxus'] own production or purchasing gas at the wellhead
from third party producers and any arrangements in existence as of May 1,
1991, [Maxus] agrees not to enter into any arrangements with third party
gatherers other than NGC which would negatively affect the processing
capacity for NGC's gas [,] (2)


* * *


 

 3.4 Payment for Plant Product - [Maxus] shall pay NGC each month as NGC's
share of the Plant Products an amount equal to the proceeds from the sale
of eighty-five percent (85%) of the Plant Products attributable to NGC's Gas
which is processed at the Plant [,]


* * *



 10.1 Term - This agreement shall remain in full force and effect for five (5) years
from the first day of the month immediately following the month in which
[Maxus] has given NGC written notice that the first flow has begun into the
second processing unit and thereafter shall continue on a month-to-month
basis unless terminated by either party by giving the other party thirty . . .
days prior written notice . . . [and,]


* * *



 14.9 Successors and Assigns - This agreement shall be binding upon and will
inure to the benefit of the parties hereto, their respective successor and
assigns, and upon any assignment or transfer of this agreement or of any
interest by either party in the facilities herein described, the assignee shall
agree and be deemed hereby to have agreed to perform the obligations
hereunder of the assigning party relative to the facilities or property so
assigned . . . .


Furthermore, the trial court found that in April of 1993, NGC began reducing deliveries of
gas to Maxus. Approximately ten months later, it stopped all deliveries. This was so
because the gathering system was acquired by Apache Corporation, which entity
subsequently transferred it to Transok Gas Gathering Company. 

 The trial court made other findings, which no one disputes. First among these is 
the determination that NGC represented that it owned the Muletrain Lateral and
Moorewood East Lateral systems through which gas was to be transferred to Maxus. 
Moreover, this finding comports with NGC's representation in paragraph 2.1 of the contract
wherein it stated that it "owns . . . the necessary facilities for the delivery of gas to the
Processing Plant ." The necessary facilities included the NGC Muletrain and Moorewood
East Laterals. Additionally, this finding is of import because, according to the testimony,
the entity gathering the gas ordinarily had the contractual right to process and remove the
liquids from it. Other pertinent, and undisputed, findings are that 1) NGC represented that
it had "'control of certain volumes of gas available for processing,'" and 2) "Transok
offered to take over NGC's position under the Maxus contract and pay NGC consideration
for it, but NGC refused."

Issues One, Two and Three -- No Breach or Evidence of Breach


 Through its first three issues, NGC contends that, upon a "proper construction" of
the contract, it did not breach same nor is there evidence of a breach. The "proper
construction" alluded to is one which simply obligated it to provide Maxus the gas that it
owned or controlled and transported through the two Laterals so long as it owned or
controlled the gas. Since it no longer owned or controlled either Lateral or the gas
transported through them once Apache and then Transok acquired the Laterals, its
obligation to provide gas to Maxus ended. And, because it was not obligated to provide
that gas to Maxus, it did not breach the contract, NGC concludes. We disagree and
overrule the points. 

 Authority 

 As can be seen, resolution of this dispute entails interpretation of the contract and
its amendments. Thus, various rules regulating the construction of contracts are worth
noting. First, we must remember that construing an unambiguous contract involves a
question of law. Cross Timbers Oil Co. v. Exxon Corp., 22 S.W.3d at 26; Borders v. KRLB,
Inc., 727 S.W.2d 357, 359 (Tex. App.--Amarillo 1987, writ ref'd n.r.e.). Because it does,
we need not defer to any interpretation afforded it by the trial court. Cross Timbers Oil Co.
v. Exxon Corp., 22 S.W.3d at 26. Second, when interpreting an instrument, we strive to
give effect to its parties' intent. Id. Furthermore, that intent is garnered from the language
of the contract, which language is considered in its entirety. Id. That is, we peruse the
complete document to understand, harmonize, and effectuate all of its provisions. Id. So
too must we afford the words contained in the agreement their plain, ordinary, and
generally accepted meaning, unless the instrument requires otherwise. Id.; Sun Operating,
Ltd. v. Holt, 984 S.W.2d 277, 285 (Tex. App.--Amarillo 1998, pet. denied).

 Finally, in applying the foregoing rules we may not rewrite the agreement to mean
something it did not. Cross Timbers Oil Co. v. Exxon Corp., 22 S.W.3d at 26; Borders v.
KRLB, Inc., 727 S.W.2d at 359. Simply put, we cannot change the contract merely
because we or one of the parties comes to dislike its provisions or thinks that something
else is needed. HECI Explor. Co. v. Neel, 982 S.W.2d 881, 888-89 (Tex. 1998); Cross
Timbers Oil Co. v. Exxon Corp., 22 S.W.3d at 26. This is so because parties to the
agreement are considered masters of their own choices. They are entitled to select what
terms and provisions to include in a contract before executing it. And, in so choosing,
each is entitled to rely upon the words selected to demarcate their respective obligations
and rights. In short, the parties strike the deal they choose to strike and, thus, voluntarily
bind themselves in the manner they choose. Cross Timbers Oil Co. v. Exxon Corp., 22
S.W.3d at 26. And, that is why parties are bound by their agreement as written. Cross
Timbers Oil Co. v. Exxon Corp., 22 S.W.3d at 26; Emmer v. Phillips Petroleum Co., 668
S.W.2d 487, 490 (Tex. App.--Amarillo 1984, no writ). For a court to change the parties'
agreement merely because it did not like the contract, or because one of the parties
subsequently found it distasteful, would be to undermine not only the sanctity afforded the
instrument but also the expectations of those who created and relied upon it. Cross
Timbers Oil Co. v. Exxon Corp., 22 S.W.3d at 26-7. With this said, we turn to the
agreement before us. 

 Application of Authority 

 Through the preamble and paragraph 2.1 of the contract, NGC represented to
Maxus that it 1) owned the gas gathering system, which included the Muletrain and
Moorewood East Laterals, and 2) had control of a certain quantity of the gas transported
through it which was available for processing. Then, according to paragraphs 3.1 and 10.1
of the amendments, it promised to provide Maxus, for five years, with a specific amount of
that gas via the pipe that it purportedly owned. Natural Gas Clearinghouse v. Midgard
Energy Co., 23 S.W.3d at 377 (wherein we previously held that the agreement obligated
NGC to deliver "all gas controlled by [it] in excess of 20,000,000 cubic feet of gas per day
gathered through the East Moorewood and Muletrain Laterals"). Absent from these
provisions or any other is language indicating that NGC's ownership of the gathering
system or right to control the gas alluded to in the preamble was finite or subject to
termination. The opposite is quite true, for if paragraph 14.9 (relating to assignment) is
considered, (which it must given the rules of construction), it is clear that both parties
intended that the processing of gas from the Laterals through Maxus' Roger Mills Plant
continue for at least five years. Also clear is the necessary implication that NGC had a
right to gather and pipe gas through those Laterals for at least the term of the contract and
in amounts sufficient to supply the quantities specified in paragraph 3.1. This is so
because 1) NGC agreed to provide the gas in the specified quantities for five years, 2)
nothing in the contract illustrated that its gathering rights were finite or subject to
termination, 3) nothing in the contract expressly conditioned NGC's performance upon its
continued ownership of the gathering system, and 4) NGC, in good faith, could not have
modified its obligation under 3.1 to supply the specified quantities if it knew that it could
not or intended not to supply them at the time of the modification. (3)
 

 In plain words, NGC effectively said to Maxus via the contract that: "There's this
gas I control through pipeline I own, and I promise to deliver a specified amount of it to you
for five years." The contractual language giving rise to this promise was and is neither
ambiguous nor unclear, and this is the only plausible interpretation of the agreement. 
Despite that, NGC would now have the court read into its promise some type of
contingency, that is, language conditioning its duty to perform on its continued control of
the gas. And, as basis for our doing so, it directs us to the Supreme Court's opinion in
Northern Nat. Gas Co. v. Conoco, Inc., 986 S.W.2d 603 (Tex. 1998). (4) 

 In Northern, Conoco agreed to receive and Northern agreed to deliver "'all gas for
gathering, compressing and processing in keeping with all the quantity and other
provisions of [Northern's] various gas purchase contracts in effect from time to time." 
Northern Nat. Gas Co. v. Conoco, Inc., 939 S.W.2d 676, 678 (Tex. App.--El Paso, 1996),
affirmed in part, reversed in part, 986 S.W.2d 603 (Tex. 1998) (Emphasis added). Also,
contained in the agreement was a provision stating that the accord was to be effective "'for
so long as the various Gas Purchase contracts dedicated herein remain in effect, but not
less than twenty . . . years . . . .'" Id. For various reasons which are unimportant to our
dispute, Northern bought out its interests in the gas purchase contracts and stopped
sending gas to Conoco for processing. Conoco sued alleging that Northern was obligated
to provide it gas. While the trial court agreed with Conoco, neither the intermediate court
of appeals nor the Supreme Court did. This was so because Northern's obligation was
expressly tied to the "gas purchase contracts in effect from time to time" with its producers. 
According to the court, "[t]his language by its clear and plain terms, anticipated changes
in Northern's gas purchase contracts." Id. at 679. In other words, the duty to provide gas
was expressly contingent upon the gas purchase contracts which may have existed from
time to time. If none did, then it had no duty to deliver to Conoco non-existent gas bought
under non-existent contracts. Moreover, nothing in the agreement obligated Northern to
buy the gas from the producers or otherwise enter into gas purchase contracts. Id. Thus,
when the underlying gas purchase contracts were terminated, Northern's obligation to
deliver gas to Conoco ended, according to the court. Id. 

 In short, the court in Northern found that Northern's duty to deliver was dependent
upon the existence of "gas purchase contracts in effect from time to time" between
Northern and those producing gas. This differs from the situation and contract before us. 
Nowhere does the NGC/Maxus agreement contain a provision referencing other contracts
between NGC, its producers, or anyone else. Nor does it contain a provision expressly
qualifying NGC's obligation to perform upon the existence of or its obligations under any
other contract. Indeed, nothing was said about anyone having a right to acquire the gas
gathering system from NGC and its subsidiaries and thereby end NGC's control over the
gas from the Laterals. Nor does anything in the agreement expressly tie NGC's duty to
perform to the existence of third-party contracts granting it the right to acquire gas from the
Laterals. Similarly absent is any provision relieving NGC from supplying gas to Maxus if
NGC conveyed the pipeline to others and, thereby, lost control over the gas. Indeed, if the
Laterals were conveyed to another, the parties expressly contemplated, via paragraph 14.9
of the contract, that the entity acquiring the "facility" would assume the obligation to
provide the gas to Maxus. Instead, NGC told Maxus, through the contract, that it owned
the pipeline, had control of gas, and promised to deliver that gas for five years. That is a
far cry from saying "if I get gas under contracts which may be in existence from time to
time, I will deliver it to you for processing for five years." The latter situation existed in
Northern but not here, and that is why Northern is inapposite.

 The situation before us is no different from that in which Farmer X agrees to deliver
to Buyer Y 1000 bushels of wheat. Farmer X cannot then deliver the bushels to Z and
profess immunity from suit by Y because he no longer had the wheat when it came time
to deliver it to Y. Here, NGC said it owned the pipeline and controlled the gas out of which
it promised to deliver the specified quantity for five years. It did not promise to deliver
whatever gas it had when it came time to deliver or that it would deliver gas as long as it
owned the pipeline or controlled the gas. Given that Apache had the option to buy the
gathering system, NGC could have easily provided for that contingency. But, it did not. 
Consequently, we may not rewrite the agreement to provide for circumstances omitted from
the agreement simply because NGC now finds that it cannot perform. (5) Cross Timbers Oil
Co. v. Exxon, Inc., supra. As stated long ago, a "party's failure to exempt himself from
responsibility in the event of the happening of [a] contingency will be attributable to his
own folly, and he [nonetheless] will be held to make good his contract." Davis v. Davis,
266 S.W. 797, 798 (Tex. Civ. App.--El Paso 1924, no writ). That remains true today. (6) 

 Of record is evidence that NGC bound itself to supply Maxus with gas from the
Muletrain and East Moorewood Laterals for five years and that it did not do that contrary
to its promise. Consequently, there exists some evidence that it breached its contract with
Maxus, and we again hold that Maxus established NGC's contract liability. (7) Natural Gas
Clearinghouse v. Midgard Energy Co., 23 S.W.3d at 376. (8)

Issues Four, Five, and Six - Admissibility of Vandivere's Testimony


 In its fourth, fifth, and sixth issues, NGC questions the sufficiency of the evidence
to support the damages awarded. It does so by first attacking the trial court's decision to
admit the expert testimony of William Vandivere. Vandivere testified about the added
operating expense attributable to processing the gas NGC failed to provide. Because it
should have been excluded, according to NGC, no evidence supported the award of
damages. Furthermore, the trial court purportedly erred in admitting it because 1)
Vandivere was not qualified to render an expert opinion on the topic and 2) it was based
on unreliable data purportedly illustrating those expenses. Assuming arguendo that the
testimony was inadmissible, we find the error in admitting it harmless and overrule the
issues. 

 It is clear that when a dispute is tried to the court, as opposed to a jury, we presume
that the trial judge disregarded inadmissible testimony, unless the record discloses
otherwise. Gillespie v. Gillespie, 644 S.W.2d 449, 450 (Tex. 1982); Williford Energy Co.
v. Submergible Cable Serv., Inc., 895 S.W.2d 379, 388 (Tex. App.--Amarillo 1994, no writ). 
Moreover, the admission of such evidence does not warrant reversal if there otherwise
appears of record competent evidence supporting the trial court's decision. Id. 

 Here, Maxus conceded that the trial court did not rely on that portion of Vandivere's
testimony regarding operating expenses. NGC not only accepted but also agreed with this
concession in its reply brief. (9) Consequently, nothing prevents us from presuming that the
allegedly inadmissible evidence had no effect on the trial court's decision regarding
damages. 

 More importantly, other evidence appears of record supporting the trial court's
finding viz the operating expenses which would have been incurred by Maxus had NGC
performed its agreement. That evidence was presented by NGC via its own expert
witnesses. One testified that those expenses approximated $22,500 per month. Then, he
acknowledged that another of NGC's testifying experts used "some other ways to look at
it from some of the other data . . . ." When asked if the conclusions derived by use of
those "other ways" were "in line with what [he] did," the witness responded, "[i]n my
opinion, yes, I - - I think we're all in that [$]20,000 a month range roughly." Given that the
trial court found the monthly operating expense to be $20,000, we can safely conclude that
the decision was supported, at the very least, by the testimony of NGC's experts.

 NGC would have us ignore the evidence provided by its own experts since it was
purportedly offered solely to rebut the evidence offered by Vandivere. And, as basis for
urging us to do so, the company cites the well-settled rule that one does not waive his
objection to the improper admission of evidence by attempting to rebut, minimize, or
explain that evidence via other evidence. Transcontinental Gas Pipeline Corp. v. Texaco,
Inc., 35 S.W.3d 658, 670 (Tex. App.--Houston [1st Dist.] 2001, pet. denied). Yet,
Transcontinental concerns the waiver of an objection to the admission of improper
evidence. It does not purport to hold that the evidence tendered by the objecting party
cannot be used to assess whether the verdict enjoys the requisite evidentiary support. Nor
do we think that the Transcontinental court could have so held. Indeed, in determining
whether any evidence supports the verdict, the reviewing body must consider "all the
evidence" in a light favorable to the verdict. Id. at 671. If all the evidence appearing of
record must be considered, then, logically, we must analyze the evidence presented by all
the litigants, not just that presented by one party or the other. So, in reviewing the
evidence proffered by all the litigants, we must necessarily consider that of NGC on the
matter as well. 

 Moreover, while NGC may believe our consideration of its evidence to be unfair
under the circumstances, we liken the situation to that involving a motion for directed
verdict. If a defendant were to move for a directed verdict after the plaintiff rests and if the 
trial court were to deny it, then the movant has a choice to make. He may stand on his
motion, rest, and complain about the decision on appeal. Or, he may proceed with his
defense and tender his own evidence. If he chooses the latter, then he waives his prior
complaint about the sufficiency of the evidence. Cliffs Drilling Co. v. Burrows, 930 S.W.2d
709, 712 (Tex. App.--Houston [1st Dist.] 1996, no writ); Hamill v. Brashear, 513 S.W.2d
602, 609 (Tex. Civ. App.--Amarillo 1974, writ ref'd n.r.e.). More importantly, should the
motion be renewed at the end of trial, the trial court is not restricted to perusing only the
evidence admitted before the plaintiff rested in deciding whether to grant it. The contrary
is true. The trial judge not only may but must look at all the evidence, including that
offered by the defendant, in assessing whether a material issue of fact exists which
warrants submission of the case to the jury. Id. Thus, by proceeding, the defendant may
effectively fill the void about which he complained, and no impropriety arises from
considering the defendant's own evidence when deciding if the void was filled. We view
that to be the situation here. 

 NGC had a choice to make. It made it by not only attacking the foundation
underlying Vandivere's opinions but also by tendering evidence that it believed accurately
reflected the operating expenses which Maxus would have incurred. Having made the
choice, having pursued a course that did more than simply attack the qualifications of
Vandivere and the accuracy of his data and methodology, and having proffered evidence
relevant to the issue of expenses, we, like the courts in Hamill and Cliffs Drilling, find no
impropriety in considering all the evidence in resolving the issue before us. Simply put,
we must consider it given the standard of review applicable to resolving insufficiency
claims. 


Issue Seven - Damage Evidence for March 1994


 Via its seventh issue, NGC asserts that the trial court erred in awarding Maxus
damages for gas which went undelivered during the month of March 1994. The amount
of damages involved is $57,143.57. Furthermore, the trial court allegedly erred because
Vandivere opined that inclusion of the sum was speculative. We overrule the issue.

 NGC's contention implicates its bypass right under the amended contract. Therein,
the parties agreed that it could "bypass the gas at the Plant if processing of such gas [was]
uneconomical in NGC's sole opinion." Given this provision, the company was obligated
to provide gas each month unless it 1) decided "in its sole opinion" that processing the gas
was "uneconomical" for that month and then 2) opted to bypass for that reason. 
Furthermore, in calculating Maxus' damages, Vandivere apparently omitted several months
of gas because he concluded that NGC would have bypassed gas at those times. 
However, he included damages for the month of March 1994 despite the supposed chance
that gas may have been bypassed for that month as well. Whether or not NGC would have
opted to do so was "about a tie," according to Vandivere. So, he was "speculating on that
one." And, because he was "speculating," it was error to include the amount in his
calculations, according to NGC. 

 While interesting, NGC's contention is flawed. If we are to enforce the contract as
written, then we must conclude that NGC was required to provide gas each month until it
opted to bypass. So, any calculation of damages must necessarily begin with the premise
that gas would have been provided each month. Next, while NGC had the right to bypass
gas, the right was conditional. Moreover, the circumstances under which that condition
was to arise were far from definite. That is, they were not ascertainable through the
application of any expressed formula. Rather, NGC "in its sole opinion" was entitled to
decide when processing the gas would be "uneconomical". (10) Thus, only NGC could decide
if and when bypass would occur. Vandivere was not NGC. Nor was he an officer or
employee of that company. So, he could not exercise the discretion vested solely in NGC. 
Furthermore, the latter cited us to no evidence of record indicating that Vandivere was
privy to the indicia or formula, if any, which NGC may have used, at any particular time,
to determine whether, at any particular time, processing gas was "uneconomical." Given
this, to venture a guess about whether or not NGC would exercise a right at any particular
time and under conditions which only it could assess in its discretion would be utter
speculation on the part of Vandivere. (11) So, the error, if any, arose not from Vandivere
including March 1994 in his calculations but by omitting therefrom the months about which
he speculated that NGC would have bypassed its gas. 

Issues Eight and Nine - Prejudgment Interest Rate


 Via its eighth and ninth issues, NGC argues that the trial court erred in refusing to
calculate prejudgment interest at the rate of six percent per annum under §302.002 of the
Texas Finance Code and toll the accrual of such interest for two years. We overrule the
issues.

 Six Percent 

 As to the contention that the trial court should have calculated prejudgment interest
at six percent as opposed to ten, we note that it is founded upon statutory language that
did not exist at the time of trial and entry of the final judgment. Though §302.002 once
directed that prejudgment interest was to accrue at six percent per year on "all contracts
ascertaining the amount payable" when no specified rate was agreed upon by the parties,
the statute was amended in 1999. Additionally, the amendment became effective on
September 1, 1999. S.B. 1368, 76th Leg., Reg. Sess., Gen & Spec. Laws, Ch. 62, §20.01
p. 420 (1999). So at the time of trial, the statute actually read:

 If a creditor has not agreed with an obligor to charge the obligor any interest,
the creditor may charge and receive . . . legal interest at the rate of six
percent a year on the principal amount of the credit extended beginning on
the 30th day after the date on which the amount is due . . . .


Tex. Fin. Code Ann. §302.002 (Vernon Supp. 2003). As can be seen, nothing is said
about applying to "all contracts ascertaining the amount payable." (Emphasis added). 

 Moreover, reading the amendment in its context leads us to conclude that it does
not even apply to the transaction at bar. That this is true can be seen simply from reading
the definitions of "creditor" and "obligor." The former denotes a "person who loans money
or otherwise extends credit," id. at §301.002(a)(3), while the latter describes one "to whom
money is loaned or credit is otherwise extended." Id. at §301.002(a)(13). Neither
definition encompasses a mere judgment creditor, such as Maxus, or judgment debtor,
such as NGC. (12) Id. at §301.002(a)(3) & (13)(A). Nor did Maxus sue NGC to collect a loan
or credit extended by Maxus to NGC. 

 In short, by amending the section in 1999 and replacing the old language with new 
and distinct words, the legislature effectively repealed the proviso upon which NGC relies. 
State v. Eversole, 889 S.W.2d 418, 425 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd)
(holding it to be a general rule of statutory construction that when the legislature amends
a particular statute and omits certain language of the former statute in its amended
version, the legislature specifically intends that the omitted portion is to no longer be the
law); Eoff v. Pace, 25 S.W.2d 264, 266-67 (Tex. Civ. App.--Eastland 1930), rev'd on other
grounds, 48 S.W.2d 956 (Tex. Comm'n App. 1932) (stating that where a statute is revised
and some parts of the original act are omitted from the amendment, the parts which are
omitted cannot be revived by construction, but are to be considered as annulled); see
Gateley v. Humphrey, 151 Tex. 588, 254 S.W.2d 98, 101 (1952) (holding that the fact that
significant words are omitted from the re-enactment or amendment of a statute imports a
conclusive presumption that the legislature intended to exclude the object theretofore
accomplished by the abandoned words). Moreover, the enabling legislation accompanying
the change said nothing about retaining the vitality of the old statute for any purpose. So,
because the provision on which NGC relies was repealed before final judgment was
entered at bar, the trial court did not err in refusing to apply it. See Quick v. City of Austin,
7 S.W.3d 109, 128 (Tex. 1999) (stating that when a right or remedy is dependent on a
statute, the unqualified repeal of that statute operates to deprive the party of all such rights
that have not become vested or reduced to final judgment); Phil H. Pierce Co. v. Watkins,
114 Tex. 153, 263 S.W. 905, 907 (1924) (holding that the repeal of a statute without a
savings clause in the repealing law requires the remedies under the former statute to give
way to those provided for in the new one). (13)

 We do not ignore that NGC cites Aquila Southwest Pipeline, Inc. v. Harmony
Exploration, Inc., 48 S.W.3d 225 (Tex. App.--San Antonio 2001, pet. denied) for the
proposition that the old version of §302.002 applies despite the 1999 amendments. We
further acknowledge that the court in Aquila applied the old statute to the dispute there
involved. So too did it note that the statute had been amended. Yet, nowhere in the
opinion did the intermediate appellate court expressly address the effect of the amendment
upon the dispute. Furthermore, whether that issue was considered by the court is
unknown. Indeed, it seems as though the panel was concerned with whether interest was
to be calculated pursuant to statute or rules of equity as described in Johnson & Higgins, 
Inc. v. Kenneco Energy, 962 S.W.2d 507 (Tex. 1998), not whether the pre-1999 version
of §302.002 remained in existence. 

 More importantly, in Johnson & Higgins the Supreme Court uttered a comment
which proves quite telling. In footnote 9, it concluded by saying that: "[i]n any event, at
the time the trial court's judgment was rendered in this case, section 6 was the operative
provision." Id. at 528 n.9 (Emphasis added). From the italicized portion of the phrase, it
is apparent the Supreme Court believed that the statute in existence at the time the
judgment was signed controls. In view of this and the fact that Aquila does not expressly
address the particular dispute before us, we choose not to follow Aquila. 

 Tolling of Interest

 Regarding the tolling matter, NGC posits that the accrual of prejudgment interest 
should have been tolled, per §304.108 of the Texas Finance Code, for the time period
during which the cause was previously on appeal. (14) Assuming arguendo that §304.108
applies to suits other than for wrongful death, personal injury or property damage, see Tex.
Fin. Code Ann. §304.101 (Vernon Supp. 2003) (limiting application of the subtitle to such
claims), we nevertheless conclude that the argument is meritless. 

 According to NGC, the two years in question was needed to secure reversal of a
summary judgment purportedly founded upon a false affidavit. Yet, we did not reverse the
summary judgment on that basis. Instead, we reversed because Maxus failed to attach to
its motion for summary judgment various records upon which Vandivere relied when
formulating the opinions expressed in his affidavit. Natural Gas Clearinghouse v. Midgard
Energy Co., 23 S.W.3d at 378-79. Moreover, of the three points urged by NGC implicating
that affidavit and mentioned in our prior opinion, none involved the allegation that the
affiant sponsored a false document. Id. at 378. Finally, NGC has not cited us to any
finding made by any court of competent jurisdiction concluding that any part of the affidavit
in question was false. Given this, the trial court did not abuse its discretion in refusing to
toll the accrual of prejudgment interest. See City of Alamo v. Casas, 960 S.W.2d 240, 260
(Tex. App.--Corpus Christi 1997, pet. denied) (holding that decisions regarding whether
to toll the accrual of prejudgment interest lie within the trial court's discretion). 

Issues Ten and Eleven - Attorney's Fees
 

 The final two issues before us concern the attorney's fees awarded to Maxus. NGC
initially contends that the trial court erred in awarding Maxus fees incurred while
unsuccessfully defending a summary judgment on appeal. Then it argues that fees related
to litigation against Transok and the prosecution of the fraud chose-in-action against NGC
were not properly segregated from the total award. We sustain the first issue and overrule
the last.

 


 Fees Incurred During Prior Appeal

 The trial court found that "fees incurred by Maxus on a prior appeal were reasonably
incurred in the prosecution of this matter" and "are properly included as reasonable
attorney's fees . . . ." Though their amount went unspecified by the trial court, the fees
alluded to were incurred when Maxus attempted to defend on appeal a final summary
judgment entered by the trial court. As previously mentioned, we reversed that summary
judgment and remanded the cause for a new trial. See Natural Gas Clearinghouse v.
Midgard Energy Co., 23 S.W.3d at 380. 

 Authority holds that an appellee may not recover attorney's fees related to
unsuccessfully defending a judgment on appeal. Picket v. Keene, 47 S.W.2d 67, 78 (Tex.
App.--Corpus Christi 2001, no pet.); Smith v. Smith, 757 S.W.2d 422, 426 (Tex. App.--Dallas 1988, writ denied); Brown v. Eubank, 443 S.W.2d 386, 391 (Tex. Civ. App.--Dallas
1969, no writ) (refusing to award the appellee costs incurred in unsuccessfully defending
a prior appeal). To hold otherwise would be to penalize a litigant for pursuing a successful
appeal. Smith v. Smith, 757 S.W.2d at 426. Given this, the decision of the trial court to
award Maxus attorney's fees for unsuccessfully defending on appeal a prior summary
judgment did not comport with guiding rules and principles and, therefore, constituted an
abuse of discretion. Caldwell & Hurst v. Myers, 714 S.W.2d 63, 65 (Tex. App.--Houston
[14th Dist.] 1986, writ ref'd n.r.e.) (stating that a trial court has discretion in determining the
amount of fees to award but not in determining whether to award fees). 

 Segregation of Fees

 NGC next complains of two ways in which Maxus allegedly failed to segregate
attorney's fees. The first concerns fees incurred in prosecuting its claim against Transok,
a party ultimately dismissed from the suit. The second involves the purported failure to
distinguish between fees incurred by Maxus while prosecuting its claim of fraud against
NGC from those incurred in pursuing its claim of breached contract.

 As to the former, counsel for Maxus testified that the total amount of fees incurred
in prosecuting the entire suit was $525,000. From that sum, he deducted $25,000 as
representative of the fees related to the Transok claims. Thereafter, the trial court
awarded Maxus only $462,597. Before us, NGC asserts that "far too little has been
deducted for the four and a half years of legal fees incurred by Maxus in prosecuting its
claims against Transok." In making this argument, however, NGC fails to explain what
other sums it thinks should have been excluded. Instead, it merely refers to an exhibit of
Maxus purporting to illustrate the fees incurred and concludes that "[a]lthough partially
redacted, the descriptions in those statements reflect significant Transok-related fees." 
How and why they do also goes unmentioned. To adequately brief an issue, a litigant
must do more than provide us with mere conclusions. He must analyze and explain his
contention. Wilkinson v. Dallas/Fort Worth Intern. Airport Board, 54 S.W.3d 1, 19-20 (Tex.
App.--Dallas 2001, pet. denied). It is not our duty to create argument where none is
provided. So, in failing to explain its contention or direct us to the specific "significant
Transok-related fees" to which it alludes, NGC did not adequately brief the issue. And, this
results in its waiver. Id. at 20 (holding that the failure to adequately brief an issue results
in the waiver of the issue). 

 Nevertheless, and as previously mentioned, there appears of record evidence that
the "Transok-related fees" were segregated from the entire amount sought from NGC. 
Moreover, the trial court excluded from its award the segregated sum plus more. 
Consequently, we cannot say that the award constituted an abuse of discretion. See
Wilemon v. Wilemon, 930 S.W.2d 290, 294 (Tex. App.--Waco 1996, no writ) (holding that
a trial court does not abuse its discretion as long as some evidence of substantive and
probative force supports its decision).

 As to the second contention, we acknowledge that one seeking fees has the burden
to distinguish between those incurred while prosecuting a claim for which fees may be
awarded from all others. Aetna Cas. & Sur. v. Wild, 944 S.W.2d 37, 40-41 (Tex. App.--Amarillo 1997, writ denied). Yet, as with all rules, this too has its exceptions. For
instance, segregation is not required "when the causes of action . . . are dependent upon
the same set of facts or circumstances and thus are 'intertwined to the point of being
inseparable' . . . ." Stewart Title Guaranty Co. v. Sterling, 822 S.W.2d 1, 11-12 (Tex.
1991), quoting Gill Sav. Ass'n v. Chair King, Inc., 783 S.W.2d 674 (Tex. App.--Houston
[14th Dist.] 1989), modified, 797 S.W.2d 31 (Tex. 1990). Should that circumstance occur,
then the entire amount covering all claims may be awarded. Id. 

 Here, counsel for Maxus testified that the facts pertinent to the fraud and contract
claims were so intertwined that the fees could not be segregated. NGC acknowledges the
argument in its brief. Yet, to evince that the trial court erred in agreeing with Maxus'
counsel, NGC simply asserts that he "admitted, the fraud claim accrued in 1990 or 1991,
when the alleged misrepresentation occurred, while the contract claim did not accrue until
1993, when the alleged breach occurred." Then it concludes by saying that the "proof
needed to establish fraud -- including a knowing misrepresentation, reliance and intent to
induce reliance -- was not common to the proof of the contract claim, which turned on
contract interpretation, as applied to largely undisputed facts." Much like the preceding
argument, this one too lacks substantive analysis and explanation. Why it matters that the
claims purportedly accrued on different dates goes totally undeveloped. Similarly missing
is any explanation as to why the same representations giving rise to the contract and
underlying the claim of breach may not also evince fraud. This is of import because it is
quite conceivable that facts tending to prove a claim of breached contract may also
establish fraud. See e.g., Pegasus Energy Group , Inc. v. Cheyenne Petroleum Co., 3
S.W.3d 112, 131 (Tex. App.--Corpus Christi 1999, pet. denied) (wherein the court
recognized that the facts underlying the claim of fraud were intertwined with those
underlying the claim of breached contract). And, that the two claims may have different
elements is irrelevant since the focus lies upon the commonality of the facts involved, as
opposed to the identity between the elements of each cause. So, again, we are left to
address a briefing void, and because we are, the contention is waived. Smith v. Comm'n
for Lawyer Discipline, 42 S.W.3d 362, 364 (Tex. App.--Houston [14th Dist.] 2001, no pet.)

 Accordingly, we sever from the judgment, reverse, and remand to the trial court for
further proceedings that portion of the trial court's judgment which awards Maxus
attorney's fees of $462,597 "through trial." In all other respects, the judgment of the trial
court is affirmed.

 Brian Quinn

 Justice
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't
Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 
2. Section 3.1 of the contract was one of the provisions amended after execution of the original
agreement. Before amendment, the parties stated therein that NGC was to deliver a "quantity of gas equal
to the greater of . . . the volume necessary to have 10,000 MMBTU/day be redelivered by Operator from
NGC's share of Residue Gas and bypass gas . . . or such volume representing existing available spare
processing capacity at the plant." They also expressly acknowledged that Maxus "will be supplying gas for
processing at the Plant from its own production and supplied by others (Operator's Gas) and the volume of
Operator's Gas may be in an amount that causes the Residue Gas redelivered to NGC to be less than
10,000 MMBTUs/day."
3. It is clear that the buying and selling of oil and gas constitutes a transaction in goods. El Paso Nat.
Gas Co. v. Minco Oil & Gas Co., 8 S.W.3d 309, 313 (Tex. 1999). If the buying and selling of gas constitutes
a transaction in goods, then it logically follows that the buying and selling of the components of gas also
constitutes a transaction in goods. And, since it does, then in modifying its original promise regarding the
amount of gas it would provide, NGC was obligated to act in good faith. See id. (acknowledging that one
transacting in goods has a statutory obligation to act in good faith in the performance, enforcement and
modification of their agreements).

4. In issuing its opinion, the Supreme Court provided little exposition or analysis of the contract there
involved and its terms. This was most likely so since the court expressly agreed with the analysis of the
matter contained in the opinion of the intermediate appellate court. Northern Nat. Gas Co. v. Conoco, Inc.,
986 S.W.2d 603, 606 (Tex. 1999). Given this, we focus upon the opinion of the intermediate appellate court
to determine why Northern was absolved of liability.
5. We note that NGC did not raise in its brief the affirmative defense of impossibility.
6. We agree with NGC's proposition that paragraph 1.6 refers to the natural gas it owned or had a right
to control. Indeed, to deliver gas which it did not own or over which it had no right of control would be to
deliver gas it converted from others. Yet, in so construing the provision, we do not read it as somehow
resurrecting a contingency relieving it from performing if another company acquires the gathering system
or the Laterals. Indeed, throughout the contract is reference to different classes of gas which Maxus (the
operator) had a right to process. Those classes included "Operator's gas," gas of third-parties other than
NGC, and NGC's gas. So, it is logical that in specifying what gas NGC was to deliver and receive
compensation for delivering the parties would take care to demarcate NGC's gas as the pertinent gas.
7. To the extent NGC contends that the record contained no evidence of damage due to its breach
of contract, we note that the contention is based upon the trial court's supposed interpretation of the contract. 
According to NGC, the trial court allegedly held that the contract entitled it to provide gas from any source,
not simply that from the Muletrain and Moorewood East Laterals. Yet, the trial court did not so interpret the
contract. Nor do we. Rather, the contract obligated NGC to provide gas from those two Laterals in the
amount and for the period specified in the contract. Thus, whether Maxus proved the amount of profit it
would have garnered had NGC been entitled to provide it gas from any source is irrelevant to the disposition
of this appeal. 
8. On rehearing, we reversed and remanded as to all issues pursuant to Tex. R. App. P. 44.1(b)
because we could not order a separate trial on damages alone.
9. In its reply brief, NGC stated: "As Maxus admits, the trial court 'did not accept or rely upon Mr.
Vandivere's testimony' on that essential element of damages [i.e. operating expenses saved] -- the very
element that NGC objected to and now raises on appeal." 
10. Indeed, neither the contract nor the parties attempted to explain what was meant by the term
"uneconomical." The latter could evince a situation wherein the income received did not exceed the
expenses incurred or where the income, though it exceeded the expenses, was not sufficient, from NGC's
point of view, to warrant pursuit of the endeavor. Simply put, the term is quite indefinite and, therefore,
invested NGC with much discretion.
11. Interestingly, Vandivere admitted as much. In attempting to explain why he included March in his
calculations, he stated "because you see when I calculate . . . I don't know what their [NGC's] gas price was
. . . I don't know what their [NGC's] situation was . . . ."
12. A judgment creditor is one to whom a money judgment is payable, Tex. Fin. Code Ann.
§301.002(a)(5) (Vernon Supp. 2003), while a judgment debtor is one obligated to pay a money judgment. 
Id. at §301.002(a)(6). 
13. Our holding is simply a reiteration of the rule dictating that "a litigant has no vested right in a
remedy, and that remedial statutes are valid and control the litigation from the date they become law, and
all proceedings taken thereafter must be under the new law." Phil H. Pierce Co. v. Watkins, 114 Tex. 153,
263 S.W. 905, 907 (1924); Price Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 354 (Tex. App.--Houston [14th Dist.] 2001, pet. denied). Given that statutes relating to damages are remedial, see Price
Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d at 354 (stating that one does not have a vested right to a
particular measure of damages for a breach of contract), and that prejudgment interest is simply a form of
damages, Johnson & Higgins, Inc. v. Kenneco Energy, 962 S.W.2d 507, 528 (Tex. 1998), then any
amendment to §302.002 in 1999 applied to this case and controlled at the time of judgment. And, since at
the time of judgment, the statutory rate of interest mentioned in §302.002 did not encompass disputes of the
ilk at bar, the trial court was not obligated to calculate interest under §302.002.
14. The statute reads: "In addition to the exceptions provided by Section 304.105, a court may order
that prejudgment interest does not accrue during periods of delay in the trial." Tex. Fin. Code Ann.
§304.108(a) (Vernon Supp. 2003).