United States Court of Appeals
Fifth Circuit

**F I L E D**

November 18, 2003

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 02-50321
_____

In the Matter of: R.H. Transport Inc.

Debtor

_____

Rocky Hunt; Sylvia Ayala Hunt; R. H. Transport Inc; Johnny W. Thomas, Trustee,

Appellees – Cross-Appellants,

versus

Parkway Transport Inc.; Parkway Distributors Inc; Parkway Custom Carriage Inc,

Appellants – Cross Appellees.

_____

Appeals from the United States District Court
for the Western District of Texas
(98-CV-393)

_____

Before WIENER, CLEMENT and PRADO, Circuit Judges.

PRADO, Circuit Judge.[1]

     Appellants Parkway Transport, Inc., Parkway Distributors, Inc., and Parkway Custom Carriage, Inc. (collectively "Parkway") appeal from a judgment in favor of Rocky Hunt and his wife Sylvia Hunt, along with R.H. Transport, Inc., – the Hunts' company– and RHT's bankruptcy trustee.   For the following reasons, we vacate

---

[1]Pursuant to 5th Cir. R. 47.5, this Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1

and remand.

**Facts**

In November 1991, Rocky and Sylvia Hunt started a business leasing trucks to Parkway, a subsidiary of San Antonio-based grocery chain H.E.B. Hunt, a truck salesman, had never before run a trucking company. Hunt bought his first two trucks in December 1991. On April 9, 1992, Hunt incorporated as R.H. Transport, Inc. (RHT). In 1992, Hunt added six more trucks and another in early 1993, financing all through the 100% financing offered by the HEB Credit Union to Parkway operators. Hunt ultimately purchased eleven trucks, but never had more than nine at one time. Hunt alleges that Roland Hamel, manager of contractor development at Parkway, told him a single-driver truck would get 3,000-5,000 miles per week and a team truck, 5,000-8,000 miles per week. Hunt says he relied on this representation when he started his trucking business and financed additional trucks. Hamel denies making any promises regarding mileage.

Parkway and Hunt entered into a lease for each of the eleven trucks, whereby Hunt leased the trucks to Parkway for hauling freight and Parkway agreed to pay Hunt based on an attached rate schedule. These leases allowed either party to terminate with 15 days notice, but did not contain any provision as to mileage. Also not in the lease was Parkway's first-in, first-out policy as to dispatches, which Hunt testified was breached by Parkway, or

2

Parkway's exclusivity rule, whereby its contractors could not run trucks at other carriers who competed with Parkway. The leases did, however, contain an integration clause. When Hunt did not receive the 3,000/5,000 miles per week that he felt he had been promised, he complained to Parkway. In 1993, Hunt was having severe cash flow problems, and in June 1993, Hunt reduced his fleet. On August 26, 1993, Hunt gave written termination notice to Parkway on five trucks, indicating that he would keep two trucks, with Parkway. Jaye Wells, manager of contractor development for Parkway, asked Hunt to stagger removal of his trucks and Hunt agreed. On September 8, 1993, without written notice, Parkway recalled a Hunt driver from a run and suspended the leases on all seven Hunt trucks. Hunt moved the seven trucks to another company, Pan American Express, in September 1993. In February and April of 1994, the credit union repossessed the trucks, and Hunt and RHT subsequently filed for bankruptcy.

### Procedural History

This case has a procedural history few would envy. A non-core bankruptcy proceeding, the case originally worked its way through the bankruptcy court. After granting summary judgment on several of Hunt and RHT's claims, the bankruptcy court held a bench trial in December 1997 on Hunt and RHT's contract and fraud claims. These claims were: (1) that Parkway breached its oral promise to provide 3,000-5,000 individual miles and 5,000-8,000

3

team miles; (2) that Parkway committed fraud; (3) that Parkway breached an implied contract term to provide Hunt with reasonable miles; (4) that Parkway breached its first-in, first-out policy;(5) that Parkway breached its no-forced-dispatch policy; (6) that Parkway improperly controlled its contractors' employees; and (7) that Parkway failed to comply with the termination provisions in the lease.

On April 3, 1998, the bankruptcy court issued a report and recommendation to the district court, finding that Hunt and RHT had failed to prove that Parkway had promised Hunt any mileage amount. Therefore, the claims for fraud and for breach of an oral promise to provide 3,000-5,000 miles per week for individual trucks and between 5,000- 8,000 miles for team trucks must fail. The bankruptcy court did, however, find three breaches of contract. First, the bankruptcy court found that the contract contained an implied provision to provide reasonable miles and that Parkway breached that provision. In reaching this conclusion, the bankruptcy court determined that national mileage averages provided by Parkway's expert were "reasonable miles." Additionally, the bankruptcy court found that Parkway breached the termination and employee control provisions of Hunt's leases. Ultimately, however, the bankruptcy court recommended that Hunt and RHT take nothing because any calculation of lost profits would be entirely too speculative in light of RHT's chronic

4

operation at a loss.

Hunt and RHT filed motions for reconsideration. The district court referred these motions to the bankruptcy court. On July 28, 1999, approximately one and a half years after the bench trial, the bankruptcy court altered its conclusions and determined that it could not consider the national averages as reasonable miles because these averages were based on hearsay. Instead, the bankruptcy court determined that the 2,700 / 4,500 miles figure used in Hunt and RHT's expert's calculations were the appropriate measure of "reasonable miles." The bankruptcy court decided, in contrast to its original determination, that lost profits through the end of the contract were not too speculative. Because of this change, the bankruptcy court recommended awarding Hunt and RHT $337,790.00 in damages, plus pre-judgment and post-judgment interest. The bankruptcy court did not alter its conclusion that future profits were too speculative.

On August 6, 1999, Parkway moved for an extension of time to file its objections to the bankruptcy court's report and recommendations. The bankruptcy court granted this motion, giving Parkway "an additional twenty (20) days" beyond the original deadline, "or until September 2, 1999." Unfortunately for Parkway, the two dates were not the same: 20 days from the original deadline was August 30, not September 2. Parkway filed

5

its objections with the district court on September 2, 1999, and Hunt and RHT moved to strike them because they were two days late.[2] Parkway, Hunt, and RHT each filed objections to the supplemental recommendation; Hunt and RHT also filed a motion to strike Parkway's objections as untimely. The district court found that Parkway's objections were untimely, but considered the objections in accepting the bankruptcy court's recommendation. Judgment was entered in favor of Hunt and RHT in the amount of $337,790.00, plus pre-judgment interest of $285,733.88 and post-judgment interest.

On February 5, 2001, the bankruptcy court recommended awarding fees and expenses in the amount of $246,661.45 to Hunt's attorney, $156,903.91 to RHT's attorney and its trustee, and conditional appellate fees of $100,000 each to Hunt and RHT. The district court modified the rate of prejudgment interest, accepted the remaining findings and entered a judgment. Parkway filed a timely notice of appeal, and Hunt and RHT filed timely notices of cross-appeal.

## Standard of Review

Generally, if a party fails to timely file objections to a report and recommendation, we review the district court's acceptance of that report and recommendation only for plain

---

[2]Hunt and RHT also filed objections to the bankruptcy court's supplemental report and recommendation.

error.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).  But we engage in *de novo* review where, as here, (1) the parties complied in good faith with the (albeit erroneous) instructions of the trial court (here the bankruptcy court), and (2) the district court engaged in *de novo* review.  See Morin v. Moore, 309 F.3d 316, 320 (5th Cir. 2002).

## Implied Reasonable Miles Term

The parties' contracts did not contain an express mileage provision.  Hunt and RHT argue that because the contract provides no obligation on Parkway's part, a "reasonable miles" term must be read into the contract to prevent it from lacking mutuality of obligation.  The bankruptcy and district courts agreed and read in the term, relying on a Texas intermediate appellate court case, Holguin v. Twin Cities Services, Inc., 750 S.W.2d 817 (Tex. App. – El Paso 1988, no writ).

Texas law generally disfavors reading an implied term into a contract, permitting it "where no other consideration is shown, making an implied obligation necessary to avoid holding the contract void for lack of consideration." Northern Natural Gas Co. v. Conoco, Inc., 986 S.W.2d 603, 607 (Tex. 1998) Consideration is "either a benefit to the promisor or a loss or detriment to the promisee," id. at 607, or, in other words, "a bargained-for exchange of promises."  Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 409 (Tex. 1997).  A court may not, however, read

an implied promise into a contract to make it "fair, wise, or just." <u>Nalle v. Taco Bell Corp</u>., 914 S.W.2d 685, 687 (Tex. App. – Austin 1996, writ denied).

The court in <u>Holguin</u> held that an otherwise illusory contract may be saved by reading into it an implied obligation to provide the subject matter of the contract. <u>Holguin</u>, 750 S.W.2d at 819. In <u>Holguin</u>, a carrier and a trucking owner-operator entered into a three-year contract for freight delivery. <u>Id</u>. at 818. After attempting to renegotiate the contract to add a non-competition clause, the carrier stopped providing any freight and attempted to terminate the contract. <u>Id</u>. In arguing that its contract was illusory, and thus void, the carrier contended that it had no obligation under the contract. <u>Id</u>. Thus, the carrier argued that it was not bound at all. The court disagreed, holding that the contract was enforceable because it contained an implied obligation on the part of the carrier to provide the subject matter of the contract. <u>Id</u>. at 819.

These contracts, like the contract in <u>Holguin</u>, may very well require us to read in an obligation to provide the subject matter of the contracts.[3] Yet assuming without deciding that they do

_____

[3]We remain skeptical, however. The Texas Supreme Court requires that the test for mutuality be applied at the time when enforcement is sought, not at the time when the promises are made:

> Though a contract be void for lack of mutuality at the time it is made, and while it remains wholly executory, yet, when there has been even a part performance by the party seeking to enforce the same, and in such part performance such party

8

contain such an implied obligation, we still must reverse the judgment.

Even if we follow <u>Holguin</u> and read into the parties' contracts an "obligation to provide the subject matter of the contract," Hunt and RHT have failed to establish the parameters of this obligation or that it was, in fact, breached. Originally, Hunt and RHT argued that 3,000 individual and 5,000 team miles (not coincidentally, the miles they claimed – but failed to prove – they had been promised) were the "reasonable miles" that must be read into the contract. This appears to be little more than an attempt to get around the unchallenged finding that they had never been promised these, or any, miles. In its original report and recommendation, the bankruptcy court

---

has rendered services or incurred expense contemplated by the parties at the time such contract was made, which confers even a remote benefit on the other party thereto, such benefit will constitute an equitable consideration, and render the entire contract valid and enforceable.

<u>Hutchings v. Slemons</u>, 141 Tex. 448, 174 S.W.2d 487, 489 (1943) (quoting <u>Big Four Ice & Cold Storage Co. v. Williams</u>, 9 S.W.2d 177, 178 (Tex.Civ.App. - Waco 1928, writ ref'd). As a result, even though the leases may have lacked mutuality at the time they were signed, once Parkway provided Hunt over 2,300 miles per week for twenty months and paid Hunt over $1 million dollars for transporting the freight, these actions constituted equitable consideration. This was not a *de minimus* provision of freight. In fact, this was the bargained-for promise: Parkway promised to pay Hunt between $0.72 and $0.86 per mile and Hunt promised to make his truck available and to haul freight. As the bankruptcy court found, the parties did not bargain for a definite or fixed amount of miles, and a definite amount of miles is unnecessary to find mutuality.

noted that "these amounts [3,000/5,000] are not substantiated." After reviewing the record, we agree with the bankruptcy court. On reconsideration, however, the bankruptcy court determined that Hunt and RHT's expert's mileage calculations, which were based on 3,000/5,000 miles (discounted by 10% for downtime) were "credible" and "supported by the testimony of other witnesses, including defendants' own corporate representative, Mr. Tom Crouch." The bankruptcy court, therefore, altered its initial finding that the 3000/5000 amount was not substantiated. In making this alteration, however, the bankruptcy court committed clear error.

We conclude that a finding is clearly erroneous "when, although there is evidence to support it, the reviewing court based on all of the evidence is left with the definite and firm conviction that a mistake has been committed." In re Luhr Bros., Inc., 325 F.3d 681, 684 (5th Cir. 2003)(quoting Walker v. Braus, 995 F.2d 77, 80 (5th Cir.1993)).

Initially, we note that the bankruptcy court's determination that Dr. Hubbard's testimony was credible does not support its finding that 2,700 individual and 4,500 team miles per week must be read into the contracts as the missing reasonable miles term. Dr. Hubbard testified that Hunt and RHT had given him these numbers, and that they were not based on his knowledge of reasonable miles. His credibility, therefore, is irrelevant to the whether these mileage amounts constitute the missing term.

10

Second, the bankruptcy court's initial determination that these numbers were unsubstantiated comports with the testimony, whereas the reconsidered findings, made approximately one and a half years later, leave us with the firm impression of error. Hunt and RHT rely on testimony by other former owner-operators that an implied promise of 3,000 miles was reasonable. Yet, because of these operators' personal disputes with Parkway, the bankruptcy court expressly found, in its initial report, that "it is hard for us to say that [the former owner-operators'] testimony was entirely disinterested."  Hunt and RHT also point to the testimony of Tom Crouch, Parkway's corporate representative as evidence that 4,500-5,100 miles were typical for team trucks.  An analysis of Crouch's testimony, however, shows that it does not actually support Hunt and RHT's contention.  Crouch's deposition testimony, introduced at trial, was that 4,500 to 5,000 miles were the most a team truck could run in a week because that was typically what drivers would want.[4] This does not adequately support the bankruptcy court's conclusion that 4,500 team miles should be read into the contract, particularly in light of the other evidence in this case.  For example, Hunt indicated on credit applications that he

---

[4]We note that Crouch also testified that individual drivers could only drive 3,000 miles a week on an occasional basis.

expected to receive 2,300 miles per week.[5]

Similarly, the testimony fails to support the bankruptcy court's implied finding that the miles Parkway provided Hunt and RHT were unreasonable.  The bankruptcy court's decision does not specifically provide any support for this implied finding, nor can we find support for it.  Therefore, Hunt and RHT failed to establish a <u>breach</u> of the implied requirement to provide the subject matter of the contract.  This was, of course, their burden.[6]

For these reasons, we conclude that the bankruptcy court was correct in its original report and recommendation and that the judgment of the district court, based on the revised report and recommendation, should be vacated.  We remand for entry of a take-nothing judgment.

VACATED AND REMANDED.

---

[5]This amount is also more in line with what Hunt received at Pan American Express after the contract with Parkway was terminated.

[6]The elements of a breach of contract claim under Texas law are (1) a valid contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) damages.  <u>Hussong v. Schwan's Sales Enters., Inc.</u>, 896 S.W.2d 320, 326 (Tex. App. – Houston [1st Dist.] 1995, no writ).