NUMBER 13-06-067-CV


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JERRY PATTERSON, COMMISSIONER

OF THE GENERAL LAND OFFICE 

OF THE STATE OF TEXAS, Appellant,


v.


GULF MARINE INSTITUTE OF 

TECHNOLOGY AND BIOMARINE

TECHNOLOGIES, INC., Appellees.

 
 

On appeal from the 130th District Court


of Matagorda County, Texas.

 

 

MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Benavides


Memorandum Opinion by Justice Garza


 Appellant, Jerry Patterson, Commissioner of the Texas General Land Office
("GLO"), appeals from a final judgment entered in favor of appellees, Gulf Marine Institute
of Technology and Bio-Marine Technologies, Inc. (collectively "GMIT"). GMIT brought suit
against Patterson's predecessor in office seeking a declaration that GMIT had a valid lease
for offshore mariculture, or fish farming, (1) operations and alleging an unconstitutional taking. 
See Tex. Const. art. 1, § 17. After a non-jury trial, the trial court declared that GMIT had
a valid lease for offshore mariculture operations and ordered that GMIT take nothing on
its takings claim. Both parties appealed the judgment of the trial court. We affirm in part
and reverse and render in part.

I. Factual Background

 On August 27, 1986, Garry Mauro, then the Texas Land Commissioner, entered into
Surface and Subsurface Lease No. 860161 (the "1986 Lease") with Tenneco Oil Company
for a tract of submerged land in the Gulf of Mexico located approximately ten miles
offshore from Matagorda County, referred to as Tract 526L. (2) The purpose of the 1986
Lease was for Tenneco to establish a platform from which they could directionally drill two
oil and gas wells into adjacent federally-owned submerged land. Seagull E & P, Inc.
("Seagull") was Tenneco's successor-in-interest to the 1986 Lease. The second paragraph
of the 1986 Lease provided that:

 The term of this lease shall be Fifty (50) years from the date of
execution of this instrument, or until the time at which the two (2) wells to be
drilled pursuant hereto shall have been plugged and abandoned in
accordance with all applicable rules and regulations promulgated by oil and
gas regulatory agencies having jurisdiction with respect thereto, if such
plugging occurs sooner.


 By the late 1990s, the wells drilled by Tenneco had been depleted, and Seagull was
ready to discontinue its oil and gas production operations that it had been conducting
pursuant to the 1986 Lease. At the same time, GMIT, a non-profit research entity led by
managing director John Ericsson, was attempting to acquire an offshore platform in the
Gulf of Mexico from which they could conduct mariculture research and commercial
operations. Ericsson determined that Tract 526L would be ideal for GMIT's purposes
because of its water quality, its relative proximity to shore, and the fact that usable
platforms were already in place.

 On September 18, 1998, Seagull and GMIT executed a "Property Transfer
Agreement" under which Seagull agreed to transfer all of its rights, titles and interests in
Tract 526L under the 1986 Lease to GMIT. Seagull also agreed to pay $1.3 million in cash
to GMIT. In exchange, GMIT agreed to assume all of Seagull's obligations under the 1986
Lease, including the eventual removal of all equipment and platforms from the leased
area. (3) The property transfer agreement also provided, in relevant part:

 Buyer [GMIT] is a knowledgeable purchaser and has had the ability
to evaluate the Assets for purchase and for their contemplated use following
the Closing. Buyer acknowledges that the term of the Lease (as currently in
effect) shall expire upon the plugging and abandonment of the Wells by
Seller [Seagull].


 Pursuant to the property transfer agreement, Seagull and GMIT executed an
"Assignment and Assumption Agreement" on September 19, 1998, which effectuated the
assignment of the 1986 Lease from Seagull to GMIT. The assignment and assumption
agreement was approved by Commissioner Mauro and provided that GMIT assumed and
agreed to perform the covenants, duties, and obligations required of the lessee under the
terms of the 1986 Lease, but that Seagull would remain jointly and severally liable on those
duties and covenants. The assignment and assumption agreement also required that
GMIT obtain a performance bond payable to Seagull to insure that GMIT would be
financially responsible for removing the existing offshore platforms.

 At the beginning of 1999, David Dewhurst succeeded Garry Mauro as Texas Land
Commissioner. Under the direction of Commissioner Dewhurst, the GLO became
increasingly skeptical about the financial viability of GMIT's mariculture project. The GLO
also became wary about engaging in business with Ericsson, who had been embroiled in
legal troubles in four other states. On May 12, 1999, the GLO sent a letter to Ericsson
informing him that they would not execute a new lease suitable for mariculture operations. (4) 

 On June 7, 1999, Ericsson wrote to Seagull acknowledging that Seagull had denied
GMIT's request to postpone the plugging of the wells on Tract 526L until December 31,
2000. Ericsson indicated in the June 7 letter that, because Seagull had denied this
request, GMIT would not allow Seagull access to the platform, as had been provided for
under the property transfer agreement.

 Nevertheless, the wells that were drilled pursuant to the 1986 Lease were finally
plugged on July 9, 1999, as reflected in forms filed by Seagull with the Texas Railroad
Commission Oil and Gas Division. On April 25, 2000, the GLO sent a letter to Ericsson
stating that the 1986 Lease had expired by its own terms and demanding that GMIT
remove the platforms from Tract 526L.

II. Procedural Background

 On May 12, 2000, GMIT filed its original petition against Commissioner Dewhurst
seeking injunctive relief and a declaration that the 1986 Lease had not been terminated by
the plugging of the two wells in July 1999. Rather, GMIT claimed that the GLO's approval
of the assignment of the 1986 Lease to GMIT had given GMIT a valid lease to conduct
mariculture operations on the State-owned land. More specifically, GMIT asserted that the
GLO had waived its right to enforce the termination provisions contained in the second
paragraph of the 1986 Lease. GMIT also alleged, in its original petition, that the decision
by the GLO not to enter into a mariculture lease was an unconstitutional taking without
compensation, (5) a due process violation, (6) a denial of equal protection of the laws, (7) and a
breach of contract. Commissioner Dewhurst filed a plea to the jurisdiction on June 5,
2000, contending that GMIT's suit was barred by the doctrine of governmental immunity. 
This was denied by order of the trial court on November 20, 2000. Dewhurst subsequently
filed an interlocutory appeal challenging the trial court's denial of its plea to the jurisdiction. 
We affirmed. See Dewhurst v. Gulf Marine Inst. of Tech., 55 S.W.3d 91 (Tex.
App.-Corpus Christi 2001, pet. denied).

 In Dewhurst, taking all of GMIT's allegations as true, (8) we found that the terms of the
assignment agreement were ambiguous because they called for an impossible condition
as a test of performance:

 The provision regarding plugging and abandoning the wells conflicts
with the purpose of the assignment as intended by the parties, who knew the
wells were plugged and abandoned by agreement as a condition to making
the assignment at the outset. This conflict must be construed so as to
render the assignment valid and effective.


55 S.W.3d at 97. (9)

 We further determined that the GLO had implicitly waived its right to enforce the
termination provision of the 1986 Lease:

 [B]ecause of the actions of Mauro and Dewhurst during and after the
execution of the assignment, the forfeiture provision was waived and the
State is estopped from terminating the assignment/lease by virtue of the two
wells having been plugged and abandoned. . . . Waiver by Mauro and
Dewhurst is implied from their conduct evidencing an intention not to insist
on compliance with the provisions of the original lease or inconsistent with
a determination to terminate the lease.


Id. at 99.

 From this conclusion we reasoned that GMIT's allegations were sufficient to
establish that the GLO had acted beyond its lawful discretion in attempting to enforce the
termination provision of the 1986 Lease and therefore, governmental immunity was
inapplicable. Id. at 101 ("In the absence of findings of fact, we must presume the trial court
considered the facts alleged and the prayer for relief and determined the nature of GMIT's
suit to be for declaratory judgment that Dewhurst acted illegally or without authority and for
injunctive relief.").

 GMIT subsequently filed a first amended original petition with the trial court, alleging
its original five claims as well as three others: (1) a claim of inverse condemnation under
article I, section 17 of the Texas Constitution and amendments V and VII to the United
States Constitution; (2) a Private Real Property Rights Preservation Act claim under
chapter 2007 of the Texas Government Code; and (3) a claim for rescission of the
agreements between the GLO, GMIT, and Seagull, as an alternative to their other seven
claims. (10) At trial, GMIT abandoned all of its claims other than: (1) its request for a
declaratory judgment, (2) its claim for an unconstitutional taking under article I, section 17
of the Texas Constitution, and (3) its request for attorney's fees.

 After four days of non-jury trial, the trial court issued its final judgment on November
15, 2005. (11) The final judgment provided in relevant part that:

 It is ORDERED and the Court hereby declares that GMIT has a valid
contract for the use of the property that is the subject of this litigation,
specifically, those lands within Tract 526L and more fully described in that
Surface and Subsurface Lease No. 860161 between [t]he State of Texas
and Tenneco Oil Company and dated August 26, 1986, and that the valid
contract is for use of the subject property for a mariculture research facility
and for related operations, and that the lease continues to in effect [sic] for
50 years after August 26, 1986, or until GMIT ceases such mariculture
operations.


 It is further ORDERED and the Court hereby declares that any
forfeiture provision contained in Surface and Subsurface Lease No. 860161,
or in any assignment agreement, assumption agreement or performance
bond related thereto in favor of the State of Texas, cannot be enforced by
Patterson or the State of Texas against GMIT, its successors or assigns, for
the duration of GMIT's use of the property for mariculture operations and
related uses.


 It is further ORDERED that GMIT take nothing on its claims against
Commissioner for takings under Tex. Const. art. 1, § 17.


 It is further ORDERED that GMIT shall have judgment against and
recover from the State of Texas its reasonable attorneys' fees and expenses
in the amount of $222,732.00 on behalf of Douglas W. Poole of the firm
McLeod, Alexander, Powel & Appfel, P.C.; $25,000 in favor of D.R. "Tom"
Uher, Attorney at Law, and $31,480.00 on behalf of Ronald B. Collins of the
firm Duckett, Bouligny & Collins, L.L.P. for a total amount of $279,212.00,
with an additional $25,000 for appeal to the Court of Appeals, $25,000 for
appeal, if any, to the Supreme Court of Texas.


 On December 2, 2005, Patterson filed a request for findings of fact and conclusions
of law. On January 5, 2006, Patterson filed a notice of past due findings of fact and
conclusions of law. However, the trial court did not file any such findings or conclusions. 
Both parties subsequently filed notices of appeal. 

III. Discussion Patterson alleges on appeal that: (1) GMIT's declaratory judgment action was
barred by governmental immunity; (2) the trial court violated the Texas Constitution by
extending property rights in Permanent School Fund ("PSF") land to a private party without
compensation; (3) there was no evidence to support the trial court's conclusion that a valid
lease for mariculture operations existed; (4) the injunctive relief granted by the trial court
was not sufficiently clear and specific; (5) the trial court's failure to issue findings of fact
and conclusions of law was harmful; and (6) the trial court abused its discretion in its award
of attorney's fees to GMIT. GMIT contends by cross-appeal that the trial court erred in (1)
denying GMIT's constitutional takings claim, and (2) reducing the amount of attorney's fees
awarded to GMIT.

A. Governmental Immunity

 By his first issue, Patterson contends that GMIT's declaratory judgment action was
barred by governmental immunity. It is well-established that governmental entities such
as the GLO enjoy immunity from suit, unless the legislature has explicitly waived such
immunity. See, e.g., Tooke v. City of Mexia, 197 S.W.3d 325, 332 (Tex. 2006); City of
Weslaco v. Borne, 210 S.W.3d 782, 789 (Tex. App.-Corpus Christi 2006, pet. denied); see
also Tex. Gov't Code Ann. § 311.034 (Vernon Supp. 2007) ("In order to preserve the
legislature's interest in managing state fiscal matters through the appropriations process,
a statute shall not be construed as a waiver of sovereign immunity unless the waiver is
effected by clear and unambiguous language."). Patterson, like Dewhurst, was sued solely
in his official capacity as Commissioner of the GLO, and as such, is entitled to the same
immunity as that afforded to governmental entities themselves. Hidalgo County v.
Gonzales, 128 S.W.3d 788, 793 (Tex. App.-Corpus Christi 2004, no pet.) ("If [a]
governmental unit would be immune due to sovereign immunity, so is the governmental
official sued in his official capacity.").

 The doctrine of governmental immunity has developed into two distinct forms: (1)
immunity from suit, which bars suit against a governmental entity altogether in the absence
of legislative consent; and (2) immunity from liability, which bars enforcement of a judgment
against a governmental entity. Tooke, 197 S.W.3d at 331. Immunity from suit implicates
a court's subject-matter jurisdiction, whereas immunity from liability does not. Tex. Dep't
of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999). Therefore, we must note and review
the application of governmental immunity from suit at any time it appears. Fincher v. City
of Texarkana, 597 S.W.2d 22, 23 (Tex. Civ. App.-Texarkana 1980, writ ref'd n.r.e.) (stating
that a trial court's lack of subject-matter jurisdiction "is fundamental error and must be
noted and reviewed by the appellate court at any time it appears.") Whether a trial court
has subject-matter jurisdiction is a question of law that we review de novo. Tex. Dep't of
Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).

1. Declaratory Judgments and Immunity

 In certain circumstances, the doctrine of governmental immunity is not applicable
to requests for declaratory relief filed pursuant to the Uniform Declaratory Judgments Act. 
See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-37.011 (Vernon Supp. 2007); see also
Tex. Highway Comm'n v. Tex. Ass'n of Steel Importers, Inc., 372 S.W.2d 525, 530 (Tex.
1963) (holding that legislative consent was not required for a declaratory judgment suit
against the Highway Commission to determine the parties' rights); Cobb v. Harrington, 190
S.W.2d 709, 712 (Tex. 1945) (holding that legislative consent was not required for
declaratory judgment suit against the State Comptroller to determine the parties' rights
under a taxation statute).

 The Texas Supreme Court has held that private parties may seek declaratory relief
against state officials who allegedly act without legal or statutory authority, without regard
to governmental immunity. Tex. Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d
849, 855 (Tex. 2002). This type of declaratory judgment action simply seeks to compel
state officers to act within their official capacity and does not attempt to subject the State
to liability, so immunity is not applicable. Id. On the other hand, declaratory judgment
actions against state officials seeking to establish a contract's validity, to enforce
performance under a contract, or to impose contractual liabilities are considered suits
against the State, and may not be imposed without explicit legislative permission. Id.; W.D.
Haden Co. v. Dodgen, 308 S.W. 2d 838, 840 (Tex. 1958) (citing Herring v. Houston Nat'l
Exch. Bank, 253 S.W. 813 (Tex. 1923)).

 Here, the purpose of GMIT's request for declaratory relief is to establish the validity
of what it claims to be a contract for mariculture operations on Tract 526L. The limited
exception to the doctrine of governmental immunity for certain declaratory judgment
actions therefore does not apply in the instant case. See Dodgen, 308 S.W.2d at 840.

2. Waiver by Conduct

 Even in the absence of a statute explicitly waiving immunity, suits against
governmental entities are permitted where it is alleged that a state official violated state
law. Dewhurst, 55 S.W.3d at 96; see Dir. of the Dep't of Agric. & Env't v. Printing Indus.
Ass'n of Tex., 600 S.W.2d 264, 265-66 (Tex. 1980) (stating that legislative consent was
not required for suit for injunctive relief against a state agency to halt unauthorized printing
equipment and printing activities); see also MHCB (USA) Leasing & Fin. Corp. v. Galveston
Cent. Appraisal Dist., No. 01-06-00529-CV, 2007 Tex. App. LEXIS 7669, at *24 (Tex.
App.-Houston [1st Dist.] Sep. 20, 2007, pet. filed) (not designated for publication). That
is because a state official's illegal or unauthorized actions are not considered "acts of the
State." Dewhurst, 55 S.W.3d at 96. Moreover, one may challenge in court an action of a
state agency that exceeds the agency's jurisdiction or authority. See MAG-T, L.P. v. Travis
Cent. Appraisal Dist., 161 S.W.3d 617, 625 (Tex. App.-Austin 2005, pet. denied) ("If a
state agency acts without authority and contrary to express statutes, the aggrieved party
may appeal directly to the courts."); see also MHCB, 2007 Tex. App. LEXIS 7669, at *26.

 The relevant inquiry, therefore, is whether Dewhurst's attempt to enforce the
termination provision in the 1986 Lease amounted to an illegal act or an act beyond the
scope of his authority. If so, the GLO would have waived its governmental immunity by its
own conduct. See Cobb, 190 S.W.2d at 712; MAG-T, L.P., 161 S.W.3d at 625.

 In Dewhurst, we found that GMIT's pleadings were sufficient to establish that the
GLO acted illegally and/or beyond its authority in attempting to enforce the termination
provision of the 1986 Lease and therefore, governmental immunity did not bar GMIT's suit. 
55 S.W.3d at 101 ("In the absence of findings of fact, we must presume the trial court
considered the facts alleged and the prayer for relief and determined the nature of GMIT's
suit to be for declaratory judgment that Dewhurst acted illegally or without authority and for
injunctive relief.").

 However, in Dewhurst we were presented with an interlocutory appeal asking us to
review the trial court's denial of a plea to the jurisdiction on governmental immunity
grounds. As such, we were required to take all allegations in GMIT's pleadings as true. 
See Dewhurst, 55 S.W.3d at 94; City of San Antonio v. Butler, 131 S.W.3d 170, 174 (Tex.
App.-San Antonio 2004, pet. denied). One of GMIT's pleadings that we assumed to be
true was that the wells drilled pursuant to the 1986 Lease were plugged on or before the
time that Mauro originally approved the assignment of the 1986 Lease. Relying on this
assumption, we found that:

 [I]t would have been impossible for the parties to perform under the
assignment/lease, if the contention of Dewhurst were accepted. This theory
would place Mauro/Dewhurst in the position of making the contract, knowing
that the plugging and abandonment of the wells had occurred prior to or
simultaneously with the execution of the assignment. It is unreasonable to
view the facts in such manner as to find that Mauro/Dewhurst contracted with
GMIT out of frivolous motives or with the intent to work a fraud. This theory
would place the parties in the position of making the contract knowing that
the condition could not be met . . . .


Dewhurst, 55 S.W.3d at 98.

 However, the undisputed trial evidence revealed that the assignment agreement
was approved by Mauro on September 19, 1998, and that the wells were plugged on July
9, 1999. Thus, contrary to GMIT's pleadings, the plugging of the wells took place over nine
months after the Commissioner approved the assignment of the 1986 Lease to GMIT.
Given these facts, it certainly was possible for the parties to perform under the assignment
agreement and the lease--indeed, ample time remained for the parties to do so. 
Therefore, the terms of those instruments were not ambiguous. (12)

 Viewed in this light, Mauro's approval of the assignment of the 1986 Lease to GMIT
was neither frivolous nor fraudulent. GMIT still retained the responsibility to obtain a new
lease suited to their unique proposed use of Tract 526L, and their awareness of this
responsibility was evidenced by their request on June 7, 1999, that Seagull postpone the
plugging of the wells until such time as a new lease could be negotiated. The negotiations
simply failed. Still, the parties remained bound to the unambiguous terms of the 1986
Lease, including the provision providing for the termination of the lease upon the plugging
and abandonment of the wells. Accordingly, Dewhurst's decision to enforce the
termination provision of the 1986 Lease was a lawful exercise of his statutory authority in
deciding how and to whom state-owned land may be leased. (13)

B. Law of the Case Doctrine and Dewhurst

 GMIT claims that Patterson is now merely "attempting to do nothing more than
reargue this Court's prior denial of [Dewhurst's] plea to the jurisdiction," and that we must
therefore reach the same conclusion as we did in Dewhurst. We disagree.

 Under the law of the case doctrine, a court of appeals is generally bound by its initial
decision if there is a subsequent appeal in the same case. Briscoe v. Goodman Corp., 102
S.W.3d 714, 716 (Tex. 2003). The doctrine is defined as that principle under which
questions of law decided on appeal to a court of last resort will govern the case throughout
its subsequent stages. Hudson v. Wakefield, 711 S.W.2d 628, 630 (Tex. 1986); see also
BFI Waste Sys. of N. Am., Inc. v. N. Alamo Water Supply Corp., No. 13-04-00069-CV,
2006 Tex. App. LEXIS 3007, at *7 (Tex. App.-Corpus Christi Apr. 13, 2006, pet. denied)
(mem. op., not designated for publication). However, a decision rendered on an issue
before the appellate court does not absolutely bar re-consideration of the same issue on
a second appeal. Briscoe, 102 S.W.3d at 716 (citing Kempner v. Huddleston, 37 S.W.
1066, 1066-67 (Tex. 1896)). Application of the doctrine lies within the discretion of the
court, depending on the particular circumstances surrounding that case. Id.; see also BFI
Waste Sys., 2006 Tex. App. LEXIS 3007, at *7.

 The instant case is a prime example of why the law of the case doctrine cannot
always apply. First, a key fact that we assumed in Dewhurst was disproved at trial: 
namely, that the plugging of wells occurred before or simultaneously to the assignment of
the 1986 Lease. GMIT argues that this Court "did not rely upon the plugging date in
fashioning its opinion" in Dewhurst. This is incorrect. We relied heavily on that assumption
in concluding that the assignment was ambiguous and that the GLO had waived its right
to enforce the termination provision of the 1986 Lease. (14)

 Although we were bound to assume GMIT's pleadings as true in Dewhurst, we are
not similarly bound here. Instead, we have the benefit of a record that includes four days
of trial testimony in which certain facts were conclusively established, including the date
that the wells were plugged. After reviewing the record, we conclude that the GLO did not
waive its right to enforce the termination provision of the 1986 Lease. Therefore, the 1986
Lease unambiguously terminated by its own terms on July 9, 1999, upon the plugging of
the wells on Tract 526L. It is of no consequence that Mauro believed GMIT had done
enough to ensure they could continue with the mariculture project, nor even that Mauro
would have declined to enforce the termination provision were he still in office. Indeed,
one of the fundamental reasons why immunity exists is to prevent governmental entities
from being bound by the policy decisions of their predecessors. Catalina Dev., Inc. v.
County of El Paso, 121 S.W.3d 704, 706 (Tex. 2003); see IT-Davy, 74 S.W.3d at 854
(stating that "legislative control ensures that current policymakers are neither bound by, nor
held accountable for, policies underlying their predecessors' long-term contracts.").

 Second, the law regarding waiver of immunity by the State's conduct has changed
significantly since we decided Dewhurst. In Fed. Sign v. Tex. State Univ., the Texas
Supreme Court suggested in a footnote that there may be circumstances "where the State
may waive its immunity by conduct other than [by] simply executing a contract." 951
S.W.2d 401, 408 n.1 (Tex. 1997). But since then, the supreme court has consistently
declined to fashion a waiver-by-conduct exception to the doctrine of governmental
immunity. See IT-Davy, 74 S.W.3d at 857 ("Creating a waiver-by-conduct exception would
force the State to expend its resources to litigate the waiver-by-conduct issue before
enjoying sovereign immunity's protections--and this would defeat many of the doctrine's
underlying policies."); Gen. Serv. Comm'n v. Little-Tex Insulation Co., 39 S.W.3d 591, 595
(Tex. 2001) ("Historically, we have left to the Legislature whether to waive sovereign
immunity . . . [t]oday we once again adhere to this principle and defer to the Legislature.");
see also Catalina Dev., Inc., 121 S.W.3d at 705-07 (finding that El Paso County's conduct
in refusing to sign property over to Catalina, despite Catalina's bid for the property being
previously approved by the county, did not waive immunity because "the County was under
no statutory obligation either to accept any potential bids or to complete a transaction if it
did decide to accept a bid.").

 To hold that the GLO's conduct implicitly waived its right to enforce the termination
provision of the 1986 Lease--and therefore that the GLO waived its immunity when it
sought to enforce that provision--would be to create the conduct-based exception to
governmental immunity that the supreme court has consistently declined to fashion.

 Consequently, we conclude that Dewhurst was well within his discretion, and did not
violate the law, when he demanded that GMIT forfeit its rights to Tract 526L upon the
termination of the 1986 Lease by its own terms. As such, the doctrine of governmental
immunity bars GMIT's suit seeking a declaration to the contrary. Accordingly, we sustain
Patterson's first issue.

C. GMIT's Takings Claim

 GMIT asserts by cross-appeal that the trial court erred in denying GMIT's claims
made pursuant to article I, section 17 of the Texas Constitution. We disagree.

 Article I, section 17 of the Texas Constitution prohibits the State from taking a
person's property under its sovereign powers without adequate compensation unless by
such person's consent. Tex. Const. art. I, § 17; see Little-Tex, 39 S.W.3d at 598. To
establish a claim under this provision, GMIT must prove (1) the State intentionally
performed certain acts, (2) that resulted in a "taking" of property, (3) for public use. Steele
v. City of Houston, 603 S.W.2d 786, 788-92 (Tex. 1980). Although we have concluded that
the doctrine of governmental immunity bars GMIT's declaratory judgment action, the
doctrine does not shield Patterson from an action for compensation under the takings
clause. See Little-Tex, 39 S.W.3d at 598; Steele, 603 S.W.2d at 791. Whether particular
facts are enough to constitute a taking is a question of law. See Little-Tex, 39 S.W.3d at
598; Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 936 (Tex. 1998).

 GMIT contends that Dewhurst's termination of the 1986 Lease deprived GMIT of its
legal right to use Tract 526L. However, the State does not have the requisite intent under
constitutional-takings jurisprudence when it merely withholds property or money from an
entity in a contract dispute. See Little-Tex, 39 S.W.3d at 598-99. In such a situation, the
State does not have the intent to take under its eminent domain powers; rather, it only has
an intent to act within the scope of the contract. Green Int'l Co. v. State, 877 S.W.2d 428,
434 (Tex. App.-Austin 1994, writ dism'd). In other words, when the State acts within a
color of right to withhold property under a contract, it is acting akin to a private citizen and
not under any sovereign powers, and so a takings claim does not lie. See Little-Tex, 39
S.W.3d at 599.

 GMIT relies on Tex. Parks & Wildlife Dep't v. Callaway, 971 S.W.2d 145 (Tex.
App.-Austin 1998, no pet.) to support its argument that the GLO's actions constituted a
compensable taking. In Callaway, the Austin court of appeals ruled that a governmental
agency's violations of both contractual and extracontractual duties constituted a valid basis
for a claim under article I, section 17. Id. at 151. However, the court was very clear in
distinguishing the factual situation in Callaway from cases where "the state's duty to pay
or perform arose solely from its contract with the private party." Id. at 150 (emphasis in
original).

 In the instant case, the GLO's duties with respect to Tract 526L arose entirely out
of its execution of the 1986 Lease. Once the 1986 Lease terminated by its own terms, the
State owed no additional extracontractual duties to GMIT. Thus, the GLO lacked the
requisite intent to form the basis of a valid takings claim. Therefore, we conclude that the
trial court did not err in denying GMIT's constitutional takings claim. Accordingly, we
overrule GMIT's first issue on cross-appeal.

D. Attorney's Fees

 Patterson asserts by his sixth issue on appeal that the trial court erred in awarding
attorney's fees that were not segregated by claim or defendant and were unsupported by
the evidence, and in awarding appellate attorney's fees that were based on conclusory
affidavit testimony and unconditioned on the successful defense of the judgment upon
appeal. GMIT asserts by its second issue on cross-appeal that the trial court erred in
awarding attorney's fees in an amount less than that requested by GMIT.

 The Uniform Declaratory Judgments Act permits a trial court to award reasonable
and necessary attorney's fees as are equitable and just. Tex. Civ. Prac. & Rem. Code §
37.009. However, in light of our conclusion that governmental immunity bars GMIT's
declaratory judgment action, the Uniform Declaratory Judgments Act is not applicable, and
therefore there is no basis for the award of attorney's fees. See In re Sw. Bell Tel. Co.,
L.P., 235 S.W.3d 619, 626 (Tex. 2007) (noting that "[a]lthough the Texas [Declaratory
Judgment Act] expressly provides for attorney's fees, it functions solely as a procedural
mechanism for resolving substantive controversies which are already within the jurisdiction
of the courts") (quoting Utica Lloyd's of Tex. v. Mitchell, 138 F.3d 208, 210 (5th Cir. 1998)). 
Accordingly, we reverse the judgment of the trial court awarding attorney's fees to GMIT
and we sustain Patterson's sixth issue. (15)

IV. Conclusion

 Because we have concluded that governmental immunity bars GMIT's declaratory
judgment action, we need not consider Patterson's four remaining appellate issues. See
Tex. R. App. P. 47.1.

 We reverse the trial court's judgment awarding declaratory relief and attorney's fees
to GMIT, and we render judgment dismissing those claims for want of jurisdiction. Further,
we affirm the trial court's judgment denying GMIT's constitutional takings claim.


 


 __________________________

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 28th day of February, 2008.
1. Mariculture is more precisely defined as "the cultivation of marine organisms in their natural
environment." Merriam Webster's Collegiate Dictionary (10th ed. 1996).
2. Tract 526L is owned by the State of Texas and has been dedicated to the Permanent School Fund
("PSF"). The PSF is a mechanism created pursuant to the Texas Constitution in order to provide funding for
the state's public schools, and proceeds from the sale of PSF land are invested for that purpose. See Tex.
Const. art. VII, §§ 2, 4. The Commissioner of the General Land Office ("GLO") may enter into leases of PSF
land for "any purpose the commissioner determines is in the best interest of the state under terms and
conditions set by the commissioner." Tex. Nat. Res. Code Ann. §§ 51.012 & 51.121 (Vernon Supp. 2006).
3. Under rules promulgated by the GLO, a lessee of submerged PSF land such as Tract 526L must
"remove all equipment, structures, machinery, tools, supplies, and other items on the [leased] property and
otherwise restore the property to the condition it was in immediately preceding issuance of th[e] lease" within
120 days of the discontinuance of the lease. 31 Tex. Admin. Code § 9.91(c)(5)(C) (1999).
4. GMIT claims that the GLO "terminated" the lease at this point, but the record does not reflect this
interpretation of events. Rather, at this time, the GLO merely announced its determination that it would
decline to execute a new lease suited to use of Tract 526L for mariculture purposes. There is no indication
that the GLO ever purported to "terminate" the 1986 Lease prior to the time it expired by its own terms.
5. See Tex. Const. art. I, § 17.
6. See Tex. Const. art. I, § 19.
7. See Tex. Const. art. I, §§ 3, 3a.
8. "We take the plaintiff's factual allegations as true . . . and we construe them in favor of the pleader." 
Dewhurst v. Gulf Marine Inst. of Tech., 55 S.W.3d 91, 94 (Tex. App.-Corpus Christi 2001, pet. denied) (citing
Brannon v. Pacific Employers Ins. Co., 224 S.W.2d 466, 469 (Tex. 1949) ("It is a fundamental rule that in
determining the jurisdiction of the trial court, the allegations of the petition made in good faith are determinative
of the cause of action.")).
9. "A construction which renders performance of the contract possible will be adopted, rather than one
which renders its performance impossible or meaningless . . . [N]o matter how clear the ordinary significance
of the words, they must not be given a meaning which, when applied to the subject matter of the contract, will
render performance impossible." Id. at 97 (citing Portland Gasoline Co. v. Superior Mktg. Co., 243 S.W.2d
823, 825 (Tex. 1951), overruled on other grounds, N. Natural Gas Co. v. Conoco, Inc., 986 S.W.2d 603, 607-608 (Tex. 1998)).
10. Both GMIT's original petition and its first amended original petition named Seagull as a defendant,
in addition to the Land Commissioner. However, GMIT non-suited Seagull four days prior to the
commencement of trial. Seagull is not a party to this appeal.
11. The trial court first issued an interlocutory judgment on August 4, 2005, on all issues raised at trial
other than the parties' claims for attorney's fees. The November 15, 2005 judgment, which is the judgment
that is appealed here, incorporated all of the rulings announced in the August 4, 2005, judgment and also
included rulings on attorney's fees.
12. Cf. Republic Nat'l Bank v. Nw. Nat'l Bank, 578 S.W.2d 109, 115 (Tex. 1979) ("If two constructions
[of a writing] are possible, a construction rendering the contract possible of performance will be preferred to
one which renders its performance impossible or meaningless.").
13. See Tex. Nat. Res. Code Ann. § 51.121 (Vernon Supp. 2006).
14. In Dewhurst, we repeatedly referred to the assumed fact that the wells had been plugged prior to
or simultaneously with the assignment of the lease:


The provision regarding plugging and abandoning the wells conflicts with the purpose of the
assignment as intended by the parties, who knew the wells were plugged and abandoned by
the agreement as a condition to making the assignment at the outset. . . .


To construe the assignment so as to terminate it before it commenced, that is, upon plugging
and abandonment of the wells, would be unreasonable, oppressive and ridiculous. . . .


[I]t would have been impossible for the parties to perform under the assignment/lease, if the
contention of Dewhurst were accepted. This theory would place Mauro/Dewhurst in the
position of making the contract, knowing that the plugging and abandonment of the wells had
occurred prior to or simultaneously with the execution of the assignment.


55 S.W.3d at 97-98.
15. Because of our conclusion with regard to attorney's fees, we need not address Patterson's
arguments regarding the segregation of the attorney's fees award or the unconditional nature of the award
of appellate attorney's fees. Though we do not reach the issue, we note that it is well-settled that a trial court
may not grant an unconditional award of appellate attorney's fees, because to do so would penalize a party
for pursuing a meritorious appeal. Pickett v. Keene, 47 S.W.3d 67, 78 (Tex. App.-Corpus Christi 2001, pet.
dism'd); Rittgers v. Rittgers, 802 S.W.2d 109, 115 (Tex. App.-Corpus Christi 1990, writ denied).